Robert J. Mangum, J.
This claim to recover damages for wrongful death and conscious pain and suffering arises from the State’s alleged negligence and malpractice in the diagnosis and treatment of decedent while she was a patient at Greedmoor State Hospital. Decedent was admitted to Greedmoor State Hospital on March 24,1969 and died on March 28,1969. At the time of her death, decedent left surviving a husband and two minor *938 children. This claim was timely filed within 90 days of the appointment of the administrator of decedent’s estate.
The claim has not been assigned or previously tried by any other court or tribunal for audit or determination.
The trial was held in Courtroom “ D ” on the 14th floor of the State Office Building, 270 Broadway in the City of New York, May 11, 1971.
Prior to decedent’s admission to Creedmoor State Hospital she had been observed by her husband on the floor of their living room in a stuporous condition. No emergency treatment was rendered at that time and it was not until two days later that she was seen by her private physician. This doctor first met decedent when she was a patient at Creedmoor in 1964, though it was not until a subsequent admission in 1966 that he had occasion to treat her. In 1967 decedent became his private patient and he treated her approximately 38 times before her last admission to Creedmoor.
On the occasion of her last visit to her private physician, Saturday, March 22, 1969, the doctor diagnosed her condition as barbiturate poisoning caused by an overdose of Nembutal. He advised the husband to maintain decedent on her normal regimen of Nembutal, and further recommended she be admitted to Manhattan General Hospital for the purpose of withdrawal from acute barbiturate intoxication. On the morning of March 24th decedent and her husband set out for Manhattan General Hospital but, upon her insistence, went instead to Creedmoor.
During the decedent’s long history of mental illness she was prescribed numerous drugs besides Nembutal to aid her overcome her somatic complaints. Her private physician testified that decedent built up a large tolerance to Nembutal which required the taking of larger quantities of the barbiturate in order to achieve the desired effect that small dosages had originally. On the occasion of her last visit to the doctor, he observed her speech slurred and general demeanor evidenced fainting, stupor and toxia, which were characteristic of the taking of large dosages of Nembutal and symptomatic of barbiturate poisoning.
Barbiturate withdrawal is considered more dangerous and debilitating than those symptoms experienced by and associated with heroin addiction. Abrupt withdrawal, following excessive use, often results in convulsions, stupor, and comatose state and death within 4 to 7 days as a result of cardiovascular collapse. (Goodman and Gilman, Pharmacological Basis of Therapeutics [3rd ed.], p. 285-297.)
The uncontroverted expert medical testimony disclosed that the only procedure available fpr the proper withdrawal of a perr *939 son addicted to barbiturates is to reduce the quantity being taken by 10 percent until the tolerance level is zero. The administering of drugs other than the precise barbiturate being consumed by the patient has no effect upon relieving the trauma concomitant with the withdrawal.
The State’s only witness was the admitting physician who took the decedent’s medical history at the time of admission. At that time the decedent denied epilepsy although she admitted to one convulsive episode four years previously, as well as another two months before the interview. Other complaints and symptomatology decedent revealed were fears of convulsions, somatic complaints, lack of concentration, impaired judgment and feelings of homicidal thoughts. She told the admitting physician “ I am afraid to go to convulsions, had them two months ago. I burnt my hands on coffee pot. I am very frightened. My stomach is in knots. I am taking Nembutal. [Emphasis ours.] I can’t concentrate, get through with a simple sentence. I am scared of people, am staying in my house.” The admitting physician testified he made no inquiry into any aspect of decedent’s dosage or duration of Nembutal use. Furthermore, though the medical records of decedent’s previous hospitalization at Oreedmoor were not immediately available at the time of this interview, there is no evidence the admitting physician made any attempt to read these documents at a later date.
The initial diagnosis by the State’s expert witness determined “ Schizophrenia, schizo-affected type. Depressed.” A physical examination as well as bacteriological and urinalysis tests were ordered and no pathology was reported. Thorazine and Stelazine were prescribed. This medication was first given orally and then, as decedent’s condition deteriorated, it was administered intravenously. An electroencephalograph was ordered on March 28, after decedent had suffered a convulsive seizure and injured her head. The hospital record, however, suggests decedent expired before the test could be administered. The hospital record also noted a similar seizure on March 25 although no electroencephalograph was ordered at that time. It is apparent from the State’s testimony and the patient’s accident report the decedent’s physical malady was considered epileptic. The subscribing doctor to the death report attributed decedent’s expiration to a cerebral vascular accident resulting from epilepsy. No autopsy was performed.
Although the State of New York is not an insurer of the safety of patients in its hospitals (Root v. State of New York, 180 Misc. 205), this does no relieve them of the duty to exercise the requisite care and skill that is consonant with accepted medical pro *940 cedure. It is universally accepted that the standard of care of a physician to a patient is to use such reasonable and ordinary care, skill and diligence as physicians in good standing in the same neighborhood, in the same general line of practice, ordinarily have and exercise in like cases (DuBois v. Decker, 130 N. Y. 325 ; Schwenk v. State of New York, 205 Misc. 407). The exercise of reasonable and ordinary care requires the physician to make a properly skillful and careful diagnosis of the ailments of a patient, and if he fails to bring to that diagnosis the proper degree of skill or care and makes an incorrect diagnosis, liability may attach (Pike v. Honsinger, 155 N. Y. 201). Where the wrong is not “ an honest error of professional judgment made by qualified and competent persons” (St. George v. State of New York, 283 App. Div. 245, 248, affd. 308 N. Y. 681), the State cannot seek refuge behind the veil that generally protects a doctor’s medical judgment.
The court finds, by the weight of the credible evidence, that decedent was suffering from barbiturate addiction at the time of her admission to Creedmoor on March 24, 1969. Therefore, using the criteria enunciated in the St. George case (supra), the court must decide whether the State’s diagnosis of epilepsy was an honest error of competent professional judgment. After carefully examining the totality of facts, not only is it patently clear the diagnosis was incorrect, but, furthermore, the entire procedure pursued on March 24 was palpably improper and not in accord with sound professional practice.
The State’s witness testified that no one informed him of decedent’s drug addiction and that if he knew he would not have admitted her to Creedmoor. This is incredible. Patients desirous of obtaining medical attention are not responsible for diagnosing their own ailments. They assist the doctor by describing their complaints and it is incumbent upon the trained and skilled physician to isolate the nature of the patient’s illness within a reasonable degree of medical certainty. Certainly decedent is not guilty of contributory negligence because she told the doctor she was taking Nembutal but omitted to inform him she was addicted to the drug. Unfortunately, the admitting physician gave no credence to decedent’s statement she was taking Nembutal.
Also, although the admitting physician did not recall having seen the decedent’s husband on March 24, the court is persuaded the husband did accompany his wife to the doctor’s office. At the conclusion of the 10-minute examination, notwithstanding the doctor would not speak with him, the court finds the husband left an empty Nembutal vial on the doctor’s desk.
*941 The claimant’s medical witness testified that the history compiled and symptoms described in the admitting report of March 24, and heretofore enumerated, were connotative of barbiturate intoxication and withdrawal. The negligence, therefore, flows from the omission to pursue the possibility of barbiturate addiction when confronted with the ample evidence that was available.
Further, it is of no import that Creedmoor is a hospital designed to handle mental patients as opposed to drug addicts. Given the nature of drug orientation in our society today, which was no less an enigma in 1969, it is apparent to this court that many mentally disturbed persons overindulge themselves with drugs in order to cope with their emotional problems. Certainly, given the reality and extent of the compulsive use of drugs in our society today, it is within the realm of sound medical procedure for a physician in a mental hospital to be alerted to the possibility that a mental patient may have a drug related problem.
‘ ‘ Over the past few years, there has been an increasing awareness that whether the drug is an opiate, a barbiturate, alcohol, or amphetamine, the psychological disturbance in the compulsive user is profound and extensive. A considerable number of such persons are thought to be overtly or incipiently schizophrenic. ’ ’ (Goodman and Gilman, Pharmacological Basis of Therapeutics, p. 287.)
Furthermore, an examination of decedent’s complete hospital records would have revealed the convulsive seizures of which decedent complained were clearly the result of drug abuse.
The July 5, 1962 admission notes from Creedmoor indicated decedent had taken an excess of sleeping pills in an attempt to commit suicide for which she was hospitalized at Bellevue. These notes revealed, on the Friday before admission to Creed-moor, she had her stomach pumped after swallowing 15 Seconal tablets. The same notations were repeated in the November 11 and November 15, 1962 records. An entry in the report of July 11, 1962 indicated decedent “ for the past six months patient stayed in bed all day long, taking Depral 8 to 10 pills a day.” In the September 8,1964 admission notes she was quoted as saying “ If I can live on pills, I will live on pills. I have a poor memory. I was in private treatment. I cannot stand being at home. I need help. I take too many pills, over 100 Depral a week. I have been going to psychiatrists for over 7 years. ” At this time she admitted to a suicidal attempt several years previously with sleeping pills. In the December 8, 1964 progress entry, the then treating physician recommended that she take Mellaril and Stelazine upon her release from the hospital.
*942 • The Creedmoor admission notes of April 5, 1966 also illustrated a dependency on the use of sleeping pills and it was recommended that she continue the use of prescribed medication after discharge. The anamnesis noted that she took sleeping pills excessively and that she would often be “ drunk ” on them.
Not to have considered the relevancy of these histories constituted a serious breach of generally accepted medical practice followed by private practitioners as well as physicians of mental hospitals similarly situated as Creedmoor. The importance of these reports cannot be overemphasized as they could have clarified the ambiguities existing with respect to symptomatology and set a more appropriate course of treatment.
During cross-examination claimant’s expert witness was asked whether he contacted the hospital to advise them of decedent’s addiction. This question, like a double-edged sword, lays bare the subtle implication that there possibly existed a concomitant responsibility with the State’s doctor to have called the private physician or contacted the decedent’s husband.
The admitting physician not only failed to consult the history records, or evidence the requisite knowledge consonant with his profession relative to barbiturate addiction, or speak with the patient’s husband or contact her private physician, but in this court’s opinion, he did nothing more than make a precursory examination.
Although any one of these factors standing alone might not be sufficient to demonstrate culpability, the totality of facts warrants this court in finding that the State, in the treatment of its patient Jacqueline O’Neil, palpably lacked the requisite skill and care possessed by the average physician attending to similar patients within the locality of the hospital. The State’s negligence is founded on a want of proper and acceptable medical procedure.
In order to establish whether the State’s negligence was the proximate cause of death, the court is not required to exclude every other possibility of death (Cole v. New York Racing Assn., 24 A D 2d 993, affd. 17 N Y 2d 761). This is particularly significant in a wrongful death action where “ a plaintiff is not held to as high a degree of proof of the cause of action as where an injured plaintiff can himself describe the occurrence ” (Nose-worthy v. City of New York, 298 N. Y. 76, 80).
Since the court is not required to determine the exact immediate cause of death with scientific certainty (Kelly v. Wills, 116 App. Div. 758), the failure to have permitted an autopsy is of no probative value. Considering the court’s finding of barbitu *943 rate addiction, the expert testimony regarding the State’s negligent omission and violation of acceptable medical standards during the initial examination, the aggravated physical consequences of uncontrolled barbiturate withdrawal, and the decedent’s convulsive seizures, there is sufficient evidence to establish, within a reasonable degree of medical certainty, that the State’s wrongful acts or omissions were the proximate cause of decedent’s death.
The death certificate specifying the cause of death as a cerebral vascular accident, resulting from epilepsy, is without proper foundation. There is nothing in the decedent’s hospital history to substantiate even the remotest possibility of such an illness, and the symptomatology at the time of admission to Creedmoor in March, 1969, was less indicative of epilepsy than connotative of barbiturate addiction. The decedent only complained of two prior convulsive seizures, no persistent headaches, and epilepsy being a recurrent malady that with a fair degree of regularity occurs throughout most of the afflicted person’s life, rarely commences in one over 30 years of age.
During one or both of decedent’s seizures she sustained bruises to her head. Assuming arguendo, the cause of death was related to a trauma of the head inflicted by these injuries, the State would still remain liable since the seizures were the consequences of barbiturate withdrawal which, because of the admitting physician’s failure to conform to the proper medical standards of the community, was not detected.
Since there is no evidence to prove the competent producing cause of death might have been the result of other causes*, the evidence is insufficient to warrant a legitimate inference that the injury was inflicted otherwise than by the State’s wrongful omission.
Suffice it to say, the circumstances disclosed in the record clearly do not place this case within the purview of the principle set forth in Dennison v. State of New York (28 A D 2d 608), Higgins v. State of New York (24 A D 2d 147), Taig v. State of New York (19 A D 2d 182), and St. George v. State of New York (283 App. Div. 245, affd. 308 N. Y. 681, supra) wherein liability was not imputed to the State for mere errors of professional medical judgment. The State’s liability herein is predicated upon an inadequate and careless medical examination.
*944 -Even where symptoms are capable of several interpretations, normal and prudent medical procedure would dictate the use of available tests and an extensive examination, which not only could have clarified the ambiguities, but detected that which was ascertainable and frustrated the otherwise natural consequences of the negligence.
It is not difficult to appreciate the immense and complicated problems of financing, staffing, and administering the vast network of State operated hospitals. However, as a learned colleague of this court eloquently observed in Whitree v. State of New York (56 Misc 2d 693, 711): “society denominates these institutions as hospitals and they should be so conducted. If they are to be no more than pens into which we are to sweep that which is offensive to ‘ normal society ’ then let us be honest and denominate them as such. Certainly, as we demean the least of us, so we demean us all. ’ ’
Claimant has the burden of proving not only that decedent might have recovered from her mental and physical aberrations sufficiently to return to her family, but that she would have madev some contribution to her beneficiaries in order to warrant a recovery for pecuniary loss (Schreck v. State of New York, 35 Misc 2d 929 ; Grasso v. State of New York, 177 Misc. 690, affd. 264 App. Div. 745, affd. 289 N. Y. 552). Though it appears reasonable to infer the decedent would have eventually been released from Creedmoor, there is a paucity of evidence to permit a finding that she would have received a favorable prognosis and, therefore, made any pecuniary contribution to the family. Although she had worked irregularly during the term of her illness as a switchboard operator, there is no evidence of the amount of money she earned or whether this was for her family’s or her personal use.
Although pain and suffering (Slutsky v. Hospital for Joint Diseases, 10 Misc 2d 853), emotional distress of beneficiaries (Sutherland v. State of New York, 189 Misc. 953), and loss of companionship (Gilbert v. Stanton Brewery, 295 N. Y. 270), are not proper elements for determining damages in a wrongful death action, consideration of the pecuniary loss of services and parental advice and guidance do fall within the purview of the statute.
Testimony regarding parental care, guidance and training that the two minor children lost as well as the personal services the decedent would have rendered her beneficiaries had she survived had not been clearly and convincingly demonstrated. Unfortunately, the tragic consequences of decedent’s chronic mental illness, her overindulgence in drugs, and various personality prob *945 lems and incidents described in the hospital record, which in deference to the family will not be enumerated, indicate a minimal or purely speculative basis for ascertaining whether decedent possessed those characteristics which would have materially benefited her husband and children had she lived (Marcado v. City of New York, 46 Misc 2d 358).
Therefore, there being no basis for an intelligent assessment of the pecuniary loss sustained to the beneficiaries as a result of decedent’s death, other than funeral expenses, the court is limited to nominal damages.
The quantum of evidence adduced at trial does not warrant a substantial recovery for conscious pain and suffering. Taking into consideration the physical consequences associated with uncontrolled barbiturate withdrawal together with the injuries decedent sustained as a result of the convulsions, the court awards $2,000 for conscious pain and suffering.
The attorneys for the respective parties have submitted proposed findings of fact and conclusions of law which have not been marked. Since the court regards its written decision as sufficient amplification of all facts deemed essential such findings need not be passed upon (see CPLR 4213 and the Revisers’ Reports appertaining thereto [McKinney’s Cons. Laws of N. Y., Book 7-B, CPLR, pp. 166, 167]). The unmarked proposed findings and conclusions will be filed with the Clerk of the Court and retained in the court’s file.
Claimant shall have judgment for the total amount of $5,945.20, of which $1,445.20 represents funeral expenses, $2,500 represents damages on the claim for wrongful death, and $2,000 is awarded on the claim for conscious pain and suffering. Interest on the sum of $3,945.20 shall be computed from March 28,1969 through the date of entry of judgment.
All motions made by the Attorney-General at the end of claimant’s case and at the end of the entire case are now denied.

 The Assistant Attorney-General suggests that death may have been the result of a cerebral aneurysm, congenital aneurysm, or arteriolosclerosis. This is purely speculative as the record is devoid of any facts to support such a finding.