ANTOINETTE SANTONI, Personal Representative
of the Estate of Mario Santoni v. ALLAN H.
MOODIE and MEYER W. JACOBSON

[No. 1187, (On Remand), September Term, 1980.]

*Decided December 6, 1982.*

130

The cause was resubmitted, on the briefs previously filed, to MOYLAN, MASON and *COUCH, JJ.

MOYLAN, J., delivered the opinion of the Court.

This case comes to us for the second time. The appellant, Antoinette Santoni, is the widow of Mario Santoni and the personal representative of his estate. She brought suit under the wrongful death statute in the Superior Court of Baltimore City against the appellees, physicians with the Baltimore City Health Department, for her husband's death. Following extensive testimony and evidence, the trial court submitted the case to the jury on the issues of the appellees' negligence and Mr. Santoni's contributory negligence. The jury found the appellees were negligent and that their negligence caused or contributed to Mr. Santoni's death, but the jury also found that Mr. Santoni himself was contributorily negligent. Recovery thereby was effectively denied the appellant. On appeal to our Court, we held, in *Santoni v. Schaerf, et al.,* 48 Md.App. 498, 428 A.2d 94 (1981), that the evidence was not sufficient to support a legally permissible inference that Mr. Santoni was contributorily negligent and that the issue should not have been submitted to the jury. We reversed the case and remanded it for a retrial on the issue of damages.

The appellees did not challenge the jury finding of primary negligence on their part and that is now the law of the case. The appellees did, however, raise two contentions on cross-appeal: (1) that they were entitled to governmental immunity, and (2) that the trial court erred in admitting evidence of twelve other deaths of persons who had received isoniazid (INH) therapy from the Baltimore City Health Department. We decided both of those issues against the appellees. Because we were reversing the case on the basis of the appellant's first contention, it was unnecessary for us to deal with the appellant's remaining four contentions.

---

* *Reporter's Note:* Couch, J., of the Court of Appeals was specially assigned inasmuch as he was on the original panel of this Court that heard and decided the case.

The Court of Appeals thereafter granted a writ of certiorari and reversed our judgment, holding that "there was evidence, if believed, from which the jury could infer that Santoni failed to heed instructions and himself was guilty of contributory negligence." *Moodie and Jacobson v. Santoni,* 292 Md. 582, 441 A.2d 323 (1982). The Court remanded the case to us for the consideration of issues raised by the appellant, Mrs. Santoni, which it was unnecessary for us to reach in view of our disposition of the case.

The appellant's remaining contentions are:

(1) That the trial court committed reversible error in refusing to admit into evidence a certain conversation between the appellant and her husband;

(2) That the trial court committed reversible error in admitting into evidence a "Danger Signs" poster;

(3) That the trial court erred in its instructions on contributory negligence; and

(4) That the jury's verdict was inconsistent and irreconcilable.

The limited nature of the remand was made very explicit by the Court of Appeals in directing that the "case [be] remanded to that Court for consideration of undecided issues." The contentions raised by the appellees on cross-appeal, which we decided against the appellees, were not addressed by the Court of Appeals, and our holding in that regard was, therefore, not disturbed. The opinion for the Court of Appeals concluded, at 292 Md. 591:

"Because of the theory upon which the Court of Special Appeals determined Mrs. Santoni's appeal, it was not obliged to address certain of her contentions. Therefore, those questions must be considered on the remand."

The facts of this case were fully set out by us in our earlier opinion. We will, however, restate them briefly. Mr. Santoni

was an Italian immigrant, who came to this country in 1955. He had little formal education, spoke broken English, and had great difficulty reading the English language. In January, 1972, he obtained employment as a custodian with the City of Baltimore. As a condition of his employment, Mr. Santoni was required to undergo a physical examination, which included a tuberculin skin test and chest X-ray. Although the chest X-ray was clear, Mr. Santoni's T.B. skin test proved positive, indicating that he had been exposed to tubercle bacilli at some time in his life and was at a greater risk of developing the disease. As a result, on January 20, 1972, Mr. Santoni was enrolled in a tuberculosis prevention program sponsored by the Baltimore City Health Department. The program involved Mr. Santoni's taking the drug isoniazid (INH) daily in pill form. This drug has been used widely in the treatment and prevention of tuberculosis. The drug was dispensed to Mr. Santoni on a monthly basis by the Baltimore City Health Department at the Eastern Chest Clinic. Mr. Santoni was to receive the drug for one year.

The tuberculosis prevention program in which Mr. Santoni was a participant was part of a special surveillance program. Sometime in 1970, after the deaths of two participants in a tuberculosis prevention program in Washington, D.C., the United States Public Health Service became concerned that the ingestion of INH might be associated with liver disease, particularly hepatitis. As a result, the following year the Public Health Service enlisted the aid of local health departments in conducting a special surveillance program which would monitor all recipients of the drug. Baltimore City, which had one of the highest tuberculosis rates in the country, agreed to participate in the special surveillance to expand its already existing program.

The protocol for the program promulgated by the U.S. Public Health Service called for dispensing the drug to each participant on a monthly basis. In this way, the patient would be required to return to the clinic each month, at which time he would be questioned about any adverse reactions. The protocol provided that the patient would be

"ask[ed] specifically about jaundice, dark urine, sustained loss of appetite, marked fatigue and prolonged nausea or vomiting." Where there was any adverse reaction, the drug would be discontinued immediately. Report cards on each patient would be sent to the Public Health Service each month. The appellee Dr. Allan H. Moodie was the administrative head of the Tuberculosis Division of the Baltimore City Health Department. Among other things, he arranged the funding and staff for the isoniazid program. Dr. Meyer W. Jacobson was the Clinical Director of the Baltimore City tuberculosis program.

Mr. Santoni faithfully went to the clinic each month from January through June, 1972, to receive his medication. He mistakenly believed that in order to work for the City of Baltimore he had to take the drug. Soon after he began taking the pills, he started to experience fatigue and decreased appetite. Then he noted fullness, abdominal discomfort, and increased flatulence. Then he could not tolerate fatty foods, his stools became lighter, his urine became darker, and he began to feel very tired. In mid-June, his wife became concerned about his condition and consulted her doctor, who prescribed coantigel and librium for Mr. Santoni. When Mr. Santoni's condition worsened, Mrs. Santoni called Dr. Joseph Notarangelo at Mercy Hospital. Mr. Santoni was admitted to Mercy on June 22. At the time of his admission, he complained of excessive gas and indigestion. Although he gave a fairly detailed history of his illness, he did not know that he was jaundiced. On the basis of Mr. Santoni's complaints, a preliminary diagnosis of a peptic ulcer was made. Ultimately, however, he was diagnosed as suffering from hepatitis. Despite excellent hospital treatment and no complications. Mr. Santoni died on July 3, 1972, of hepatitis, caused by a toxic reaction to isoniazid.

Under the circumstances and with the unchallenged finding by the jury that Mr. Santoni's death was attributable, at least in part, to the primary negligence of the appellees, the issue of Mr. Santoni's contributory negligence becomes all important. Reversing our earlier holding that there was no legally sufficient evidence of contributory

negligence to permit the jury to consider the issue, the Court of Appeals held squarely that there was a legitimate jury question in this regard. We turn now to the facts that may have pertinence on that issue of contributory negligence.

It was the intent of the special surveillance program that each participant be advised at the time of his initial clinic interview that isoniazid may have a side effect. Each participant was to be advised by a nurse as to what the signs and symptoms of that side effect are. At the time of the monthly visits, the patient was to be examined verbally as to whether he was suffering from any of those symptoms. At first, only public health nurses were permitted to interview the patients. As the program expanded, however, health aides and clerical help were authorized to conduct the follow-up interviews. There was no direct evidence at trial that Mario Santoni was ever advised or knew of the risks of taking INH or that he was properly questioned about adverse signs and symptoms at the time of his monthly clinic visits. Whatever evidence there was on this issue was totally circumstantial.

The appellant, Mrs. Santoni, introduced into evidence the computer cards which were sent to the Public Health Service after each of Mr. Santoni's visits. The face of the cards had a line for noting the number of pills taken during the preceding month. It also contained a list of reasons for not issuing isoniazid with space for check marks next to those reasons and a space for further specification. The reasons listed included "Adverse reaction," "Suspected hepatitis," and "Other illness." The backs of the cards had space for listing any medication taken by Mr. Santoni during the preceding month and for listing his alcohol and tobacco consumption.

Mr. Santoni's computer card for February listed the number of isoniazid pills taken during the previous month, but no other notation was made on the face of the card. On the back of the card, where space was provided for listing medication, there was the notation "no information." No alcohol or tobacco consumption was noted. The computer cards for both March and April listed the number of pills taken during

the preceding month, but again there were no other notations on the face of the cards. On the back of the cards, the word "none" was written across each card where space was provided for listing medication, and there was a notation of alcohol and tobacco consumption. The May 16 and June 12 computer cards had similar notations on the back as to medication and alcohol and tobacco consumption. The face of each card, however, in addition to listing the number of pills taken during the last month, also contained another notation. The May computer card contained the notation "no problem" on the line provided for recording any adverse reaction, as a reason why isoniazid was not issued. The June computer card contained the notation "no" on the same line. The Court of Appeals held that these cards "provide a clear basis for an inference" that Mr. Santoni was properly questioned about the signs and symptoms of hepatitis but that he failed to report them.

The Court, in holding that the question of contributory negligence was for the jury, stated, at 292 Md. 591:

> "Given the testimony adduced on behalf of the defense that the Baltimore City Health Department was strictly following the protocol established by the U.S. Public Health Service; that this protocol included questioning each patient relative to his symptoms each time he visited the clinic and emphasizing to each patient the importance of reporting those symptoms which might be indicative of hepatitis; that the nursing supervisor testified regarding the procedures followed, which were in accord with those of the Public Health Service; that evidence of spot checks reflected compliance with established procedures, and that notations on Santoni's card indicate that he was questioned each time he went to the clinic but that he reported no symptoms of hepatitis, we think there was evidence, if believed, from which the jury could infer that Santoni failed to heed instructions and hence was guilty of contributory negligence."

The Court of Appeals made it clear that although, in their judgment, the appellees had generated a jury issue on the subject of contributory negligence, they had *just barely* done so. There was no direct evidence of contributory negligence but only a permitted inference of such negligence. In holding that this permitted inference was enough, the Court adverted repeatedly to the extremely permissive attitude of Maryland in this regard. "Maryland has gone about as far as any state in holding that meager evidence of negligence is sufficient to carry a case to the jury." 292 Md. at 587. " 'The rule has been stated as requiring submission if there be any evidence, however slight, *legally sufficient* as tending to prove negligence. . . .' " (Emphasis in original.) *Id.* at 588, *quoting from Fowler v. Smith,* 240 Md. 240, 213 A.2d 549 (1965). " '[T]his Court has always maintained that if there be any legally relevant and competent evidence, *however slight,* from which a rational mind could infer a fact in issue, then a trial court has invaded the province of the jury by declaring a directed verdict.' " (Emphasis in original.) *Id.* at 590, *quoting Plitt v. Greenberg,* 242 Md. 359, 367-368, 219 A.2d 237 (1966). We emphasize the minimal nature of the evidence of contributory negligence to highlight the critical significance of the countervailing evidence which the appellant sought to introduce. Since a genuine jury question existed as to contributory negligence, any evidence the appellant sought to offer to negate such negligence and to dissuade the jury from drawing the inference of negligence was pivotally material. The first of the appellant's remaining contentions, which we did not find it necessary to address when the case was first before us, was:

> That the trial court committed reversible error in refusing to admit into evidence a certain conversation between the appellant and her husband.

The testimony as to the conversation, if believed, was relevant. It tended strongly to prove that Mr. Santoni had no foreseeability of harm. Relevance being beyond dispute, we turn to the issues of materiality and competence (admissibil-

ity). Materiality involves the question of whether, as a matter of law, foreseeability of harm is a pertinent issue to be decided. In holding unequivocally that it is, we turn to a consideration of the contributory negligence law in a factual posture such as this.

An important element of contributory negligence is the foreseeability of harm. To be held contributorily negligent, a person must actually have been aware of or should have appreciated the risks involved and then failed to exercise reasonable and ordinary care for his own safety. The courts have on many occasions discussed this element of foreseeability of risks and failure to exercise ordinary care. In *Menish v. Polinger Company,* 277 Md. 553, 356 A.2d 233 (1976), the Court of Appeals stated, at 277 Md. 560-561:

> "Before the doctrine of contributory negligence can be successfully invoked, it must be demonstrated that the injured party acted, or failed to act, with knowledge and appreciation, either actual or imputed, of the danger of injury which his conduct involves. . . . Stated another way, when one who knows and appreciates, or in the exercise of ordinary care should know and appreciate, the existence of danger from which injury might reasonably be anticipated, he must exercise ordinary care to avoid such injury; when by his voluntary acts or omissions he exposes himself to danger of which he has actual or imputed knowledge, he may be guilty of contributory negligence." (Citations omitted.)

In *Sanders v. Williams,* 209 Md. 149, 120 A.2d 397 (1956), the Court stated, at 209 Md. 152:

> "As is true of primary negligence, one measure of contributory negligence is the need, in a given situation, to anticipate danger. Presence or absence of reasonable foresight is an essential part of the concept. One is charged with notice of what a reasonably and ordinarily prudent person would have foreseen and so must foresee what common experi-

ence tells may, in all likelihood, occur, and to antici- pate and guard against what usually happens. On the other hand, one is not bound to anticipate every possible injury that may occur or every possible eventuality.... Absent actual or constructive knowledge to the contrary, one may act on the assumption that he will not be exposed to danger that will come only by the breach of duty which another owes him. He is not bound to anticipate negligent acts or omissions on the part of others unless, under the circumstances, an ordinarily prudent person would know, or should know, that it was not safe to make the assumption of due care on the part of the other person." (Citations omitted.)

With respect to this element of foreseeability, in discussing contributory negligence in medical malpractice cases, courts have noted the disparity between the knowledge and skill of a doctor and that of a patient. The patient is not in a position to diagnose his own ailment. Without being told, he does not know the risks of medication. He is not in a position to judge whether the prescribed course of treatment is in his best interest. As a consequence, it is not contributory negligence for a patient to follow a doctor's instructions or rely on his advice, *Largess v. Tatum,* 130 Vt. 271, 291 A.2d 398 (1972), *Los Alamos Medical Center, Inc. v. Coe,* 58 N.M. 686, 275 P.2d 175 (1954); to fail to consult another doctor when the patient has no reason to believe that the doctor's negligence has caused his injury, *Johnson v. United States,* 271 F.Supp. 205 (W.D. Ark. 1967), *Rahn v. United States,* 222 F.Supp. 775 (S.D.Ga. 1963), *Fairchild v. Brian,* 354 So.2d 675 (La.App. 1977); or to fail to diagnose his own illness, *O'Neil v. State,* 66 Misc.2d 936, 323 N.Y.S.2d 56 (1971). *See also Martineau v. Nelson,* 311 Minn. 92, 247 N.W.2d 409, 417 (1976); Annot., *Contributory Negligence or Assumption of Risk as Defense in Action against Physician or Surgeon for Malpractice,* 50 A.L.R.2d 438.

The patient has a right to rely on the doctor's knowledge and skill. The court in *Halverson v. Zimmerman,* 60 N.D.

113, 232 N.W. 754, 759 (1930), stated well the nature of this reliance:

"It is not a part of the duties of a patient to distrust his physician, or to set his judgment against that of the expert whom he has employed to treat him or to appeal to other physicians to ascertain if the physician is performing his duty properly. The very relation assumes trust and confidence on the part of the patient in the capacity and skill of the physician; and it would indeed require an unusual state of facts to render a person who is possessed of no medical skill guilty of contributory negligence because he accepts the word of his physician and trusts in the efficacy of the treatment prescribed by him. A patient has the right to rely on the professional skill of his physician, without calling others in to determine whether he really possesses such skill or not. The patient is not bound to call in other physicians, unless he becomes fully aware that the physician has not been, and is not, giving proper treatment."

57 Am.Jur.2d, *Negligence* § 324, discusses the comparative knowledge of the parties as bearing on the question of liability.

"Since knowledge of danger, either actual or imputed, is an element of negligence, whether primary negligence on the part of the defendant, or contributory negligence on the part of the plaintiff, the question of liability is sometimes resolved in a negligence action by a comparison of the knowledge of the defendant as against the knowledge of the person injured. The proposition may be stated as follows: Liability is established when it is shown that the peril, being of the defendant's creation, was known to the defendant but not to the person injured; but no liability is predicable of the injury when it appears that the injured person's knowl-

edge of the danger surpassed or equaled that of the defendant."

Applying that body of law to the evidence, or lack thereof, in the case at hand, we note that there was no direct evidence at trial that Mario Santoni knew of the risks of taking INH. No informed consent form was ever signed by him nor was there any notation on his chemoprophylaxis register sheet that he was advised of the risk of hepatitis. Whatever evidence was introduced on this issue was totally circumstantial.

It is, furthermore, clear that the key issue on the subject of contributory negligence is the foreseeability of harm on the part of Mario Santoni. If he was fully aware of the risks involved in the treatment he was taking and persisted in the treatment notwithstanding that awareness, he may well have been contributorily negligent. If, on the other hand, Mr. Santoni was unaware of the risks he was being subjected to, then he was not contributorily negligent. The pivotal issue is that of what Mario Santoni knew on the subject of risk. What had to be probed in this regard was, by definition, Mario Santoni's state of mind.

The appellant attempted to show that her husband had no knowledge of the risks of taking isoniazid. She attempted to introduce into evidence the contents of a certain conversation between herself and her husband. The appellant was asked by one of her attorneys:

"Q. What, if anything, did Mr. Santoni say to you that reflected his thinking having to do with any risks connected with Isoniazid?"

An objection was made to the question and, after the jury was excused, the following proceedings were had at the bench:

"MR. DAVIS [Appellees' attorney]: In addition to the fact that questions are hearsay, you can't prove positively the fact that Counsel is attempting to prove by the negative testimony of the wife that it was never said to her. It doesn't prove the fact.

THE COURT: That's obvious. I don't know how that shows state of mind. *I assume you're trying to get out his state of mind but the fact that he never told her that he didn't know of any risk doesn't show his state of mind.*

MR. ISRAELSON [Appellant's attorney]: I didn't ask that whether he knew of—

THE COURT: How else are you going to get it in?" (Emphasis supplied.)

Recognizing the garbled nature of a trial transcription, it is nonetheless clear that the appellant was seeking to show Mr. Santoni's state of mind and that the trial judge realized that the evidence was being offered for that purpose. It also appears that the trial judge persisted in assuming that the appellant was simply going to offer the negative fact that her husband had never registered a complaint. It appears clear to us, on the other hand, that appellant's counsel kept indicating to the court that they expected Mrs. Santoni to testify that there was an affirmative declaration from the lips of Mr. Santoni indicating that he felt there was no risk. The colloquy went on:

"MR. ISRAELSON: Precisely. *I think my question was whether he expressed to her his thinking with regard—*

THE COURT: *I assume that you put it in that phraseology to show state of mind.*

MR. ISRAELSON: *Yes.* How else, if Your Honor please, is he going — is the witness going—

THE COURT: What answer do you expect? That he didn't say anything?

MR. ISRAELSON: *On the contrary, that he told — that he told me that he didn't understand there was any risk to it, which is a state of mind.*

THE COURT: That isn't his state of mind.

MR. ISRAELSON: That you take a medication and that you don't think there is any risk to your taking it, that that is not state of mind?

MR. DAVIS: In addition, it's self—

MR. ISRAELSON: If it isn't, I really don't—

THE COURT: *What does it prove, that he didn't think it was a risk?*

MR. ISRAELSON: *It proves that he didn't think there was a risk to taking this medication."* (Emphasis supplied.)

At that point, the colloquy at the bench went off on a tangent dealing with primary negligence (whether Mr. Santoni was ever told there was a risk) rather than with contributory negligence (whether Mr. Santoni inwardly thought there was a risk).

"THE COURT: Does it prove that he was never told there was a risk?

MR. ISRAELSON: But I can't, I can't ask directly did he ever come home and tell you he was never told there was a risk. That's not state of mind. It's inferential that if he thinks there was no risk to taking it, that he had not been told there was a risk to taking it.

MR. DAVIS: That's the fact.

MR. SALSBURY [Appellant's attorney]: Or it had not been explained to him so that he understood the risk."

The discussion then returned to the subject of Mr. Santoni's state of mind:

"THE COURT: No, sir, it does not lead to that inference at all. I have ruled on it. I don't think that's a proper question to elicit a state of mind. A state of mind is with regard to some particular thing that you do, a motivation of some kind that shows your — a statement you make that shows what your state of mind is at the moment.

MR. SALSBURY: *It also tends to prove,* Your Honor, that he took — *why he took the pills faithfully even though he was sick, because he*

*thought that there was no risk involved and why he continued to take pills after he developed illness.*

THE COURT: She can testify that he kept taking the pills. I assume that you can ask such things as did he say anything about how he felt, because that's telling about your physical self.

MR. ISRAELSON: Yes, Your Honor, but *without the prelude of what I'm asking her as his own thought about it, then it would give the impression that he continued to take the pills and he continued to be ill and, therefore, he was a stupid idiot for taking something that was making him more and more ill, whereas, if he had the state of mind of believing that it was safe to take the pills and that the two were not connected,* then it gives the jury—

THE COURT: That's an inference they can make from those facts.

MR. SALSBURY: *But his state of mind I believe is crucial to that issue as to why he continued to take the pills."* (Emphasis supplied.)

The next segment of the colloquy is very unsatisfying if it is a request for a proffer. The difficulty is that the court asks the next question before counsel is able to get out fully an answer to the preceding question:

"THE COURT: What statement is going to be elicited by this?

MR. SALSBURY: That he thought that the pills were—

THE COURT: What did he say on what occasion?

MR. ISRAELSON: Either. I really don't—

THE COURT: Are you talking about generalities?

MR. SALSBURY: No.

THE COURT: You know, you're asking for a statement he made when, under what circumstances to show his state of mind, not generalities.

MR. ISRAELSON: But the state of mind, Your Honor, is that he came home—"

The direction of the discussion then seemed to shift to the question of identifying specifically the occasion on which the conversation occurred:

"THE COURT: Is a statement a statement?

MR. ISRAELSON: Yes.

THE COURT: Or it can be fifty statements.

MR. ISRAELSON: Yes.

THE COURT: But you have to specify when, where and whether on that occasion it expressed his state of mind—

MR. ISRAELSON: Right. Now, —

THE COURT: —at the time he made the statement.

MR. ISRAELSON: But in order not to lead and and at the same time to get to the point of it so as not to travel all over the horizon on it, don't you have to ask Mrs. Santoni when your husband came home from the clinic on X occasion, that's time—"

The colloquy then turned to whether appellant's counsel was trying to ask a leading question:

"THE COURT: All right, you've got those. Ask that question, did he—

MR. ISRAELSON: What if anything did he express regarding—

THE COURT: What did he say?

MR. ISRAELSON: What did he say, all right, as to any risk to him?

THE COURT: You're leading.

MR. ISRAELSON: How else am I going to identify, Your Honor? Leading isn't that horrible a thing if you're trying to go to a given point without spelling out the answer. I'm saying what did he say

with regard to any risk to himself, that can be answered. It isn't demanding an answer one way or the other. That's the only way I know of."

The next segment of discussion reveals again the failure in communication. It seems to us that appellant's counsel is continuing to indicate that they expect an affirmative statement about non-risk and that the court is continuing to assume that what is being offered is the fact that nothing was ever said about risk:

"THE COURT: And she's going to say he said nothing, right?

MR. ISRAELSON: I don't know. I'm hoping.

THE COURT: I assume you're going — you don't expect her to say that he came out and said that there was a risk?

MR. ISRAELSON: On the contrary, I was going to say that there was — I was hoping she would say I don't know the answer to this. I was hoping that she will say he indicated there was no risk.

THE COURT: I have ruled on this. What you're trying to elicit is nothing, that he made no statement about risk.

MR. ISRAELSON: Well, that's a thought I didn't have in my mind, Your Honor."

One party in this discussion is speaking of *a statement about non-risk;* the other party in this discussion is speaking about *a non-statement about risk.*

Again recognizing the frequently garbled nature of these trial transcripts, particularly when one court reporter is writing as three or four people are talking simultaneously, we are not quite sure where the next segment of the exchange is going:

"THE COURT: An exception to the hearsay rule is a statement a person makes. It's a positive statement he makes, not an absence of a statement.

146

MR. SALSBURY: It can also be an action or inaction.

MR. ISRAELSON: It can be absence of.

THE COURT: Yes, it can. What action — did he jump up and down?

MR. SALSBURY: Or inaction.

MR. ISRAELSON: That's a rule.

THE COURT: Not an inaction.

MR. SALSBURY: No action.

THE COURT: No.

MR. SALSBURY: Well,—"

The ruling that concluded the bench conference was that the appellant would not be permitted to introduce the out-of-court declaration from the lips of her late husband that would have been highly relevant on the subject of his state of mind:

"THE COURT: You have spelled out exactly what is the appropriate thing. He complained about symptoms, he had a symptomatic ache, he had a headache, he didn't have an appetite, kept taking the pills, that's his action and he complained about all the symptoms, an inference from that is what you're trying to prove, is that he thought it was safe.

MR. ISRAELSON: Well, that sure is another way to get to it but it just hadn't entered my mind. Our minds are travelling on different channels and it's just *I feel an affirmative statement is better than just that inference, if there is an affirmative statement to be made.*

THE COURT: You're asking for a non-statement. I have ruled on it." (Emphasis supplied.)

There is no question but that Mario Santoni's declarations were relevant to prove his state of mind; there is no question but that that state of mind — the awareness or nonawareness of the risks attendant upon the taking of

isoniazid — was material on the issue of contributory negligence. The only remaining question is whether the evidence of those declarations was competent and, therefore, admissible. We hold that the evidence was clearly admissible and that the refusal to accept it constituted reversible error.

Speaking directly to the admissibility of such evidence is C. McCormick, *Law of Evidence,* (2d ed. 1972), § 294, "Declarations of Mental State: (a) Declarations of Present Mental or Emotional State to Show a State of Mind or Emotion in Issue," p. 694:

> "The substantive law often makes legal rights and liabilities hinge upon the existence of a state of mind in a person involved in the transaction at issue. When this is so and a legal proceeding arises from the transaction, the mental state of the person becomes an ultimate object of search. It is not sought to be proved as circumstantial evidence of the person's earlier or later conduct but as an operative fact upon which a cause of action or defense depends. While such a state of mind may be proved by the person's actions, *the declarations of the person whose state of mind is at issue are often a primary source of evidence on this matter."* (Emphasis supplied.)

Professor McCormick then goes on to explain why such declarations are generally considered reliable, saying at p. 695:

> "The special assurance of reliability for declarations of present state of mind rests, as in the case with declarations of bodily condition, upon their spontaneity and probable sincerity. This is assured by the requirements that the declarations must purport to relate to a condition of mind or emotion existing at the time of the statement and must have been made under circumstances indicating apparent sincerity."

Cf. *Tumminello v. State,* 7 Md.App. 380, 256 A.2d 342, 344

(1969); *Purvis v. State,* 27 Md.App. 713, 343 A.2d 898, 900 (1975); *Friend v. Hamill,* 34 Md. 298, 308 (1871).

Professor Morgan spoke to the same point in *The Law of Evidence, 1941-1945,* 59 Harv. L. Rev. 481 (1946), at 570:

> "Where a person's state of mind at a specified time is relevant in itself or as tending to prove the same or a similar state of mind at a later time, evidence of his declarations asserting his presently existing state of mind is now generally received."

Dean Wigmore discussed the subject, classifying it as a "statement of mental condition" exception to the hearsay rule, in 6 *Wigmore on Evidence* § 1714 (3d ed. 1940), at 58:

> "It is indeed possible to obtain by circumstantial evidence (chiefly of conduct) some knowledge of a human being's internal state of pain, emotion, motive, design, and the like; but in directness, amount, and value, this source of evidence must usually be decidedly inferior to the person's own contemporary assertions of those conditions . . . .
>
> For the use of such statements, then, made out of court and without any obvious motive to misrepresent, there is a fair necessity, in the sense that there is no other equally satisfactory source of evidence either from the same person or elsewhere."

The scholarly authorities are in unanimous agreement both as to the admissibility of the evidence and as to the reasons for such admissibility. Hinton, *States of Mind and the Hearsay Rule,* 1 U. Chi. L. Rev. 394 (1934), observed at 414:

> "In the case of declarations to prove a mental state the dangers of hearsay are reduced to the minimum. There is no danger of lack of personal knowledge, or of faulty perception, or of failing memory, if we agree that a man is conscious of his own states of mind. The only danger is that of misstatement, which is greatly reduced by the

apparent absence of motive to deceive. In short, because of the uncertainty and inadequacy of purely circumstantial evidence in a large number of cases, declarations of intention constitute the 'best evidence that the nature of the case will admit.' "

McBaine, *Admissibility in California of Declarations of Physical or Mental Condition*, 19 Calif. L. Rev. 231 (1931), stated at 243, "The most reliable and often the only evidence of the mental state of a person is to be found from his declarations." While still sitting on the Supreme Judicial Court of Massachusetts, Oliver Wendell Holmes wrote for that court in *Elmer v. Fessenden*, 151 Mass. 359, 361-362, 24 N.E. 208 (1890), "[S]uch declarations made with no apparent motive for misstatement may be better evidence of the maker's state of mind at the time, than the subsequent testimony of the same persons."

29 Am.Jur.2d, *Evidence* § 650, "Declarations Pertaining to State of Mind," states the law, at 700:

"In a case in which the state of mind of a person at a particular time is relevant to a material issue in the case, his declarations made at that time are admissible as proof on that issue, notwithstanding they were not made in the presence of the adverse party."

31A C.J.S., *Evidence* § 255, "Mental State," states, at 668:

"Where the existence of a particular mental state in a particular individual is a relevant fact, declarations which indicate the existence or nonexistence of such state are admitted as circumstantial evidence. . . ."

Indeed, the only point that troubles the legal scholars is not the question of whether a declaration bearing on a material state of mind may come in, but rather the question of under what theory the declaration shall come in. To the extent to which the declarations are simply the circumstantial predicate from which the state of mind may be inferred,

they are deemed to be non-hearsay and do not even involve the hearsay rule. To the extent to which a declaration goes directly to the state of mind in issue, it is hearsay but is admissible hearsay under the "state of mental condition" exception to the hearsay rule. This is the seam of the zone defense where two different theories come together. As Dean Wigmore observed, *supra,* § 1715, at 62, "It is true that at certain points the Verbal Act·doctrine and the present Exception coincide practically and serve equally to admit certain sorts of statements. . . ."

Whether the declaration in question is an instance of the Hearsay Rule Inapplicable or the Hearsay Rule Satisfied, depends frequently on the linguistic accident of how the declaration is phrased. "There is no risk in taking isoniazid," is probably non-hearsay, a circumstantial fact from which we infer that Mario Santoni thought there was no risk. If, coincidentally, however, the phrasing had been, "I think there is no risk in taking isoniazid," that accident of phraseology might just serve to transmute an instance of non-hearsay into something that is technically hearsay, albeit admissible hearsay. Because the two doctrines so frequently merge at this point, the scholars have tended to group them together under a single rule of admissibility. Professor McCormick expressed this tendency, at 694:

> "In most cases, the declarations are not assertive of the declarant's present state of mind and are therefore not necessarily within the hearsay exclusionary rule. Courts, however, have tended to lump together declarations asserting the declarant's state of mind with those tending to prove the state of mind circumstantially, and have developed a general exception to the hearsay rule for them without regard to the possibility that many could be treated simply as nonhearsay."

Whatever the doctrinal theory involved, the conclusion is clear that such declarations are admissible to prove a material state of mind. We hold that the appellant suffered prejudicial error when she was denied the opportunity to present

key evidence on a critical issue, particularly where the countervailing evidence on that issue was as slight and minimal as it was here.

In view of our disposition of the appeal on this issue, it is unnecessary to reach the remaining three contentions raised by the appellant.

> *Judgment reversed; case remanded for a new trial; costs to be paid by appellees.*