939 F.Supp. 1402 (1996)
Gary D. WYATT, Sr., Plaintiff,
v.
UNITED STATES of America, Defendant.
No. 4:94CV1567-DJS.
United States District Court, E.D. Missouri, Eastern Division.
September 23, 1996.
*1403 *1404 Neil J. Maune, Walker and Maune, Granite City, IL, Bill T. Walker, Granite City, IL, for plaintiff.
Henry J. Fredericks, Asst. U.S. Attorney, St. Louis, MO, for defendant.

MEMORANDUM OPINION AND ORDER
STOHR, District Judge.
Plaintiff brings the instant medical malpractice action against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. Plaintiff is an unmarried 45-year-old male, who has been paraplegic since 1969. His claims in the instant case arise from the treatment he received for decubitus ulcers (pressure sores) on his hips and buttocks at two hospitals operated by the Department of Veterans Affairs in St. Louis, Missouri. Plaintiff alleges that the treatment he received was negligent in a number of respects, resulting in an unnecessary deterioration of his condition and ultimately necessitating the amputation of both of his legs at the hip joint.
The case was tried to the Court sitting without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of relevant fact and conclusions of law, in accordance with Fed.R.Civ.P. 52(a).

*1405 Findings of Fact

1. While in the Army in 1969, plaintiff was involved in an auto accident which left him paralyzed below the chest.
2. Prolonged pressure on the skin, especially in connection with a bony prominence of the body, causes the skin to break down and an open sore to develop. These decubitus ulcers or pressure sores are common in spinal cord injured persons such as plaintiff, who are partially immobilized and lack sensation.
3. Because of his paraplegia, plaintiff had since 1969 occasionally experienced pressure sores, and regularly endeavored to prevent them.
4. Beginning in the early 1980's, plaintiff used a Roho cushion while sitting to help prevent pressure sores on his buttocks. A Roho cushion consists of air-filled nodules, up to several inches in length, which help alleviate pressure on the buttocks. Plaintiff regularly slept on a sheepskin cover which absorbed perspiration and helped to keep his skin dry.
5. After going on a long car trip without his usual Roho cushion, plaintiff developed a number of pressure sores. He presented himself at and was admitted to the Spinal Cord Injury Unit of the Jefferson Barracks Medical Center ("Jefferson Barracks") on May 9, 1991.
6. Plaintiff was continuously in the care of defendant, at either Jefferson Barracks or John Cochran Hospital ("John Cochran"), from May 9 to July 19, 1991. Both facilities are operated by the Department of Veterans Affairs ("VA").
7. Upon his admission, plaintiff had five pressure sores of the following approximate sizes and severity:
on the right trochanter (hip), Grade II, 12½ cm;
on the left trochanter (hip), Grade III, 3 cm;
on the right ischium (buttock), Grade I-II, ½ cm;
on the left ischium (buttock), Grade I-II, ½ cm; and
on the left knee, 3½ cm, with thin eschar (a scab-like crust).
8. The severity of pressure sores is graded on a scale of I through IV, in which Grade I indicates the least severe alteration or impairment of skin integrity and Grade IV the most serious, involving extension of the wound to muscle and bone.
9. Shortly after plaintiff's admission, a Jefferson Barracks staff psychologist conducted a routine admission interview with plaintiff. The psychologist's May 13, 1991 notes indicate that plaintiff stated that his pressure sores developed during an extended car trip without his Roho cushion, and that plaintiff "appreciates how his judgment resulted in [the] pressure sore problem."
10. At or shortly after plaintiff's admission, it was determined that he had a urinary tract infection.
11. At Jefferson Barracks, plaintiff was initially placed on low-air-loss flotation as well as a Roho mattress. These pressure reductive devices are designed to facilitate healing of pressure sores and prevent the formation of new sores.
12. Smoking inhibits healing. Despite repeated warnings, plaintiff continued to smoke cigarettes regularly during his stay at the VA hospitals.
13. Plaintiff was scheduled to be turned in bed every 1 to 2 hours. At times, plaintiff was noncompliant with staff concerning turning in bed and other aspects of his treatment such as protein drinks.
14. Plaintiff's sister, Beverly York, testified that during plaintiff's stay at Jefferson Barracks, she visited him at least six evenings per week. Plaintiff's condition worsened during the month of May: he emanated a foul odor; grew weaker; lost weight; could not eat or drink; experienced shaking, fever and sweating; complained of burning in his stomach and pain in his bones and skin; and sometimes failed to recognize his sister. In late May, because of his worsening condition, Ms. York spoke to plaintiff about transferring to another hospital, but plaintiff indicated that he trusted Mary Nicholson, the nursing supervisor of the Spinal Cord Injury Unit, and wanted to continue in her care.
*1406 15. Following his admission to Jefferson Barracks, plaintiff developed a perirectal abscess. On May 21, a CAT-scan was ordered. The report revealed air in soft tissues, indicating infection by a gas-causing organism such as streptococcus.
16. On May 23, a surgical consultation was ordered, which plaintiff did not receive until a "stat" surgical consultation was ordered on June 5, after plaintiff developed a high fever and his blood pressure dropped, indicating a severe infection. Dr. Frank Johnson, Chief of the Surgical Service, testified that the surgeons ordinarily like to see patients within one day of a surgical consultation order.
17. Dr. Raj Mohapatra, a urologist and surgeon on staff at Jefferson Barracks, ordered the surgical consultation for several reasons: first, for purposes of determining whether the perirectal abscess was communicating between the bowel and plaintiff's pressure sores, and if so to divert the bowel via a colostomy, and second, for surgical debridement of plaintiff's pressure sores that could not be done bedside. Debridement, which can be performed by mechanical, chemical or surgical means, is the removal of dead, damaged or infected tissue to expose healthy tissue.
18. On June 5, plaintiff was transferred to John Cochran.
19. Plaintiff initially refused colostomy surgery, but on June 11, with plaintiff's consent, a surgery was performed to repair plaintiff's rectal abscess and to create a colostomy. The surgical procedures done at John Cochran revealed a larger area of infection than was realized by the doctors treating plaintiff at Jefferson Barracks; specifically, there was a large subcutaneous deposit of pus and stool in plaintiff's right posterior thigh, which had derived from the pressure wound on his right buttock.
20. Concerned about plaintiff's condition, Ms. York stayed with plaintiff in his room at John Cochran between June 6 and June 17. On June 12, Ms. York took a photograph of plaintiff's right hip, depicting an open rectangular pressure sore, approximately 1-1½ by 3-3½ inches in size. See Appendix, Plaintiffs Exhibit 18.
21. The possibility of osteomyelitis, infection of bone and bone marrow, was noted by a John Cochran urologist in a June 6 entry in plaintiff's records. Progress notes for June 11 reflect the likelihood of chronic osteomyelitis of exposed bone in plaintiff's pressure sores. A physician's assistant's notes dated June 28, 1991 indicate the existence of "probable bone necrosis/osteo." The same physician's assistant noted on July 1 that plaintiff "probably has an underlying osteo as source of fever." X-ray reports of July 3 show possible osteomyelitis in plaintiff's right hip. On July 5, the same physician's assistant again refers to "osteo/infected wounds" as contributing to plaintiff's continued fever.
22. During the course of plaintiff's stay at Jefferson Barracks and John Cochran, he was sporadically given different oral and intravenous antibiotics, in varying combinations. The antibiotics prescribed for plaintiff were intended solely to combat infection of his urinary tract and the perirectal abscess. No antibiotics were ever ordered specifically to treat infection of his pressure sores or osteomyelitis.
23. A wound culture was performed on plaintiff's perirectal abscess on May 26. The May 30 lab report indicates that plaintiff had four infective organisms in the area of the perirectal abscess, including heavy growths of staphylococcus aureus, a very virulent organism which can cause extensive tissue destruction, and a streptococcus species which can destroy tissue very rapidly if unchecked.
24. The antibiotic sensitivities shown on that report indicate that the staph. aureus was resistant to the antibiotics administered to plaintiff in the following weeks, and that several of the other bacteria present were only minimally sensitive to the antibiotics given. The report shows no sensitivity results for other antibiotics which were administered to plaintiff.
25. Bacteriology reports on cultures from plaintiff's hip wounds were issued on July 4, July 6 and July 7. These reports indicated the presence of a staph. aureus bacterium which was resistant to the antibiotics which *1407 had been and were then being administered to plaintiff, with the possible exception of one antibiotic which was administered only briefly from July 4-5.
26. A July 13 bacteriology report on a culture from plaintiff's left hip wound indicated that the staph. aureus infection continued, and that the staph. aureus bacterium was sensitive to an antibiotic which was begun intravenously on July 17, only two days before plaintiff left the VA hospitals.
27. General surgery and plastic surgery consults both recommended continued antibiotic treatment. Dr. Woolsey, a neurologist who is Chief of the Spinal Cord Injury Unit, admitted that plaintiff's pressure sores were not treated with antibiotics during his time in the Spinal Cord Injury Unit at Jefferson Barracks, even as he acknowledged that a clinical diagnosis of osteomyelitis would have warranted such treatment.
28. The failure to treat plaintiff with appropriate and necessary antibiotics allowed a serious staph. infection to communicate from the perirectal abscess to plaintiff's upper femur. The resulting osteomyelitis and very large wounds on both hips ultimately necessitated the amputation of both of plaintiff's legs at the hip joint.
29. The inattention to plaintiff's antibiotic treatment is consistent with Dr. Woolsey's view, expressed in an article on pressure sores which he co-authored with Dr. John McGarry, Assistant Chief of the Spinal Cord Injury Unit and another of plaintiff's treating physicians at Jefferson Barracks, that "[u]sually, removal of necrotic tissue is all that is needed to control the infectious component of a pressure sore." Robert M. Woolsey, M.D. and John D. McGarry, M.D., The Cause, Prevention, and Treatment of Pressure Sores, Neurologic Clinics, Vol. 9, No. 3, p. 804, August 1991.
30. In the same article, Drs. Woolsey and McGarry again express skepticism concerning the need for systemic antibiotics:
Systemic antibiotics are not useful in the treatment of pressure sores unless the patient has osteomyelitis or severe wound infection unresponsive to the usual modalities of local care. Fulminating sepsis with a 50% mortality rate has been reported in patients with pressure sores; however, this must be a rare occurrence because during a 15-year period of treating patients with pressure sores on a daily basis, we have never seen such a situation.
Id. at 805.
31. Plastic surgeons at John Cochran recommended the use of a Clinatron bed for plaintiff. A Clinatron bed helps to prevent pressure sores and to facilitate their healing by the use of tiny constantly moving beads and air flow, which eliminate pressure on the patient's skin and keep the skin dry.
32. The recommendation was never followed, although plaintiff was placed on other types of pressure reductive mattresses or mattress overlays. Mattresses of the type used in the Spinal Cord Injury Unit are made up of air-filled sacs, which allow the regulation of the pressure on different parts of the body or, in some cases, automatic "travelling" inflation which rotates the pressure around the body. At times, plaintiff was "bridged" with foam blocks so that his pressure sores were suspended in air.
33. Dr. Woolsey testified that the Spinal Cord Injury Unit does not use Clinatron beds because they are large and bulky and present difficulties for nurses who must lean over them to reach patients. In Dr. Woolsey's opinion, pressure-reductive mattresses or bridging, combined with effective nursing care, provide better treatment than the use of a Clinatron bed.
34. Debridement is a mainstay of treatment for pressure sores. By proper debridement, the removal of dead and infected tissue and the exposure of healthy tissue promotes healing.
35. Prior to June 20, plaintiff's wounds had been debrided by surgeons at John Cochran several times. Notes in plaintiff's records dated June 18, 1991 indicate that at that time plaintiff refused surgical debridement recommended to him by physicians at John Cochran, and instead requested transfer back to Jefferson Barracks, which was accomplished on June 19.
36. Dr. Mohapatra performed his first debridement on plaintiff at Jefferson Barracks *1408 on June 20. At that time, the wound on plaintiff's left hip measured 2" by 1½", and was of Grade III. On June 21, the sore on plaintiff's right hip measured 2" by 4", and was Grade IV with bone exposed.
37. Dr. Mohapatra performed occasional bedside debridements thereafter, and the nursing staff at Jefferson Barracks performed chemical debridement of plaintiff's wounds.
38. Two different entries in plaintiff's records, dated June 18 and 19, directed weekly follow-up visits to the surgical clinic at John Cochran for purposes of wound assessment; this was not done.
39. Although plaintiff underwent some debridement, by mechanical, chemical and surgical means, there was insufficient monitoring of the debridement process by the surgeons at John Cochran to determine when and how much additional debridement was optimal for the management of plaintiff's wounds, including optimal timing of the growth of new connective tissue and the most expert removal of dead tissue.
40. On July 18, Ms. York visited Jefferson Barracks between 4:30 and 5:00 a.m., and found plaintiff lying naked on a gurney with a sheet folded in half across his buttocks. Plaintiff was covered in sweat, "thrashing around" and did not recognize his sister. When Ms. York lifted the sheet and saw plaintiff's exposed bone through the large open pressure sore, she told a nurse that she was taking plaintiff out of Jefferson Barracks.
41. Ms. York testified that Dr. Woolsey then arrived and advised her that plaintiff was scheduled to be transferred to John Cochran for a blood transfusion, without which he would die.
42. At approximately 9:30 a.m., plaintiff was moved to John Cochran.
43. Notes entered in plaintiff's record on July 18 at John Cochran indicate that his blood pressure had dropped to 90/40 that day.
44. On July 19, plaintiff's family removed him from John Cochran and he was admitted to St. John's Mercy Medical Center.
45. Plaintiff's sister took photographs of plaintiff's right hip and buttocks as they appeared approximately one week after his admission to St. John's. The pressure sore on the right hip had grown to a hole approximately 6 by 10 inches, through which the trochanter (knobby top of the femur) and 6 to 8 inches of plaintiff's femur were exposed. Plaintiff had round open pressure sores of several inches in diameter on both buttocks. See Appendix, Plaintiff's Exhibits 19, 20 & 21.
46. The surgeon who ultimately performed the amputations of plaintiff's legs was Dr. Richard Pennell.
47. Upon his initial examination of plaintiff, on approximately July 19, Dr. Pennell found large open wounds over both hips, with the trochanter and 6 to 8 inches of the upper femur exposed. The bone surface had a yellow cast, rather than the ordinary white color, and the bone was dried out.
48. The combination of plaintiff's fever and the amount of exposed bone supported Dr. Pennell's conclusion that osteomyelitis was present in both femurs. Without its normal coverings of periosteum, muscle, subcutaneous tissues and skin, bone, which has a very poor blood supply, is susceptible to infection.
49. Plaintiff also had purulent drainage from his penis, suggesting a bladder infection. Subsequent tests and examinations indicated that an infection was being communicated through a sinus tract between the urethra, bladder and the joint between the pelvis and femurs.
50. In consultation with a plastic surgeon, it was determined that skin grafts could not be used to cover the wounds. Without supporting tissue and its blood vessels, the blood supply to the bone would be insufficient, and infection in the bone might well have spread to the skin graft in any event.
51. Because of its poor blood supply, bone, once infected, is resistant to antibiotics. All the consulting physicians agreed with Dr. Pennell that, at this advanced stage of plaintiff's case, the amount of exposed bone presented a source of recurring infection which *1409 ruled out antibiotic treatment of the osteomyelitis.
52. Dr. Pennell believed that plaintiff had a potentially life-threatening infection of his femurs, and possibly even of his pelvis.
53. In view of the size and severity of the wounds on plaintiff's buttocks and hips, the clinical diagnosis of osteomyelitis in both femurs, and the poor prospects associated with skin grafts and antibiotic treatment of the osteomyelitis, the amputation of plaintiff's legs at the hip joint was the best treatment choice available.
54. Plaintiff's left leg was amputated at the hip joint on August 12; skin and muscle from the leg was used to cover what was left of the wounds on plaintiff's buttocks and hip after the procedure. Plaintiff's right leg was amputated at the hip joint on August 28.
55. The pathology examination performed on plaintiff's right leg following its amputation disclosed areas of necrosis (dead tissue) extending into the inside of the femur, with acute and chronic osteomyelitis, indicating both long-term and recent infection in the bone.
56. The negligence of the Jefferson Barracks staff  specifically the failure to treat plaintiff's wound infections with appropriate and effective antibiotics, the delay in plaintiff's initial surgical consult at John Cochran, and the failure to insure regular surgical monitoring and evaluation of plaintiff's need for debridement  proximately caused the deterioration of plaintiff's wounds and the osteomyelitis in plaintiff's femurs, which ultimately necessitated the amputation of plaintiff's legs.
57. Plaintiff's failure to use his Roho cushion during an extended car trip negligently and causally contributed to his ultimate injury, by allowing the initial development of the sores on both buttocks and both hips, even to the severity of Grade III, prior to presenting himself for treatment at the VA hospitals. The percentage of plaintiff's contributory fault in this regard is reasonably fixed at 5%.
58. Plaintiff's smoking negligently and causally contributed to his ultimate injury, by contributing to the retardation of the healing of his wounds and to their susceptibility to serious infection. The percentage of plaintiff's contributory fault in this regard is reasonably fixed at 5%.
59. Prior to the amputation of his legs, plaintiff was able to sit up straight, move himself about in a wheelchair, and drive a car specially equipped with hand controls. Plaintiff lived alone or with a girlfriend, and was independent other than requiring assistance with showering. Plaintiff was socially active with both family and friends, and had several romantic relationships. Plaintiff's activities included office functions, picnics and barbecues, target shooting, off-road vehicles, poker games with friends, going to the swimming pool at his apartment complex, automobile repairs, shopping, going dancing and going to taverns.
60. Plaintiff is now confined to a bed, and lives virtually in one room of his rented home. Plaintiff bathes every three days with the assistance of a nurse and aide, but otherwise remains in bed. His mother does plaintiff's shopping and prepares his meals. His mother or aides must empty plaintiff's urinal and colostomy bags.
61. Plaintiff's sole transportation is by ambulance. Due to the difficulty posed by transportation, plaintiff was unable to attend his son's funeral in February, 1995.
62. Without his legs, plaintiff is unable to sit upright without bracing himself by holding onto something. He lies in his bed in a semi-reclining position; the bed has a trapeze-like bar fixed overhead which plaintiff can grasp in order to pull himself to a more upright position as needed.
63. At the time of his admission to the VA hospital in May, 1991, plaintiff was employed by Southwestern Bell Telephone as a telephone operator, at a weekly wage of $459.50. Plaintiff had worked for the telephone company for approximately ten years.
64. Prior to that time, plaintiff held a job at the Army hospital at Fort Leonard Wood.
65. Plaintiff has been unable to work since the amputation of his legs.
*1410 66. Plaintiff considers himself to be disfigured and to look "like a freak" because he has no legs. Plaintiff has experienced depression after his amputation, and for a time saw a psychologist.
67. Following the amputation of his legs, plaintiff has continued to experience pressure sores, particularly on his buttocks. At times, plaintiff has been hospitalized or in a nursing home for treatment, particularly for sores on his buttocks which have not totally healed following the hospitalization at issue in this case.
68. When the sores on plaintiff's buttocks have improved, any prolonged sitting in an upright position causes a recurrence of the sores.
69. Because of the lack of his femurs to provide a base and balance for sitting, coupled with the chronic pressure sores on his buttocks which stem from the treatment plaintiff received at the VA hospitals, plaintiff is unable to sit upright for any length of time, even were he to have a custom-made amputee wheelchair.
70. Primarily for this reason, plaintiff is not employable. Plaintiff receives approximately $333 per month under a long-term disability plan through Southwestern Bell Telephone, and approximately $686 per month in Social Security disability.
71. Plaintiff was in the care of St. John's Mercy Medical Center hospital from July 19, 1991 through September 5, 1991, and in the care of St. John's Mercy Medical Center's rehabilitation facility from September 5, 1991 to September 23, 1991. This care included plaintiff's amputations and his recuperation and rehabilitation therefrom. The reasonable and necessary charges of the hospital totalled $108,719.89. The reasonable and necessary charges of the rehabilitation facility totalled $12,687.61.
72. Plaintiff was readmitted to St. John's Mercy Medical Center hospital from November 26, 1991 to November 30, 1991, for additional care and treatment related to the perirectal abscess which plaintiff developed during his VA hospitalization. The reasonable and necessary charges for this hospitalization totalled $5,891.41.
73. The total charges billed by the VA for plaintiff's hospitalization from May 9, 1991 through July 19, 1991 are $51,095.00.
74. At the time of trial, plaintiff had a reasonable life expectancy of an additional 24 years, to age 65.
75. Based on plaintiff's weekly wage at the time of his hospitalization in May, 1991, and based on a finding that plaintiff reasonably might have continued to work for an additional 21 years to age 62, plaintiff's lost wages total $501,774.00, consisting of $125,443.50 in wages lost between May, 1991 and the date of this finding, and $376,330.50 in lost wages from the date of this finding to age 62.
76. Based on the evidence presented at trial, plaintiff's damages for pain, suffering, mental anguish, inconvenience, physical impairment, disfigurement and loss of capacity to enjoy life reasonably total $385,000. Of that figure, and because required by § 538.215.1 R.S.Mo., the Court would fix the percentage of plaintiff's non-economic damages accrued at the time of this finding at 25% of the total, or $96,250, and the percentage of plaintiff's non-economic damages to be accrued after this finding at 75% of the total, or $288,750.
77. Plaintiff's future medical damages, arising from reasonable expenses for necessary drugs, therapy, and medical, surgical, nursing, x-ray, custodial and other health and rehabilitative services which are attributable to plaintiff's injuries caused by the negligence of defendant, reasonably total $2,082,625.

Conclusions of Law
The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1346(b). Venue in this district is proper pursuant to 28 U.S.C. § 1402(b), in that plaintiff resides in the district and the acts and omissions complained of occurred in the district.

I. Liability

A. Defendant's Negligence

The Federal Tort Claims Act waives the sovereign immunity of the United States *1411 and renders it liable in tort "in the same manner and to the same extent as a private individual under like circumstances, [except] for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. The law of Missouri, as "the law of the place where the act or omission occurred," provides the substantive decisional law applicable to plaintiff's negligence claims. 28 U.S.C. § 1346(b). Under Missouri law, the three elements of a prima facie case of medical malpractice are:
(1) proof that defendant's act or omission failed to meet the requisite standard of care; (2) proof that the act or omission was performed negligently; and (3) proof of a causal connection between the act or omission and the injury sustained by the plaintiff.
Klaus v. Deen, 883 S.W.2d 904, 907 (Mo.App. 1994).
The Court finds that plaintiff has met his burden of proving liability with respect to three of the four species of negligence which he alleges. The testimony of plaintiff's medical expert, supported by more than a preponderance of the evidence as to the underlying facts, has persuaded the Court that the medical treatment rendered to plaintiff by defendant's agents fell below the degree of skill and learning ordinarily used by medical professionals under similar circumstances in the areas of antibiotic treatment for plaintiff's pressure sores, delay in compliance with the May 23, 1991 order for a surgical consultation, and failure to follow the order of the John Cochran Surgical Service for weekly follow-up visits for evaluation of plaintiff's wounds by the surgical staff. The Court also readily finds that these failures and omissions were negligently committed, and that each constituted a substantial factor in plaintiff's ultimate injury, namely the amputation of his legs.
These three failures on the part of the Jefferson Barracks staff permitted infection to run rampant in plaintiff's pressure sores to the point that both femurs became infected, and otherwise allowed the wounds to enlarge and deteriorate to the point that the amputations became necessary. The several bacteriology reports showing untreated infections in plaintiff's buttocks and hip wounds, the repeated references in plaintiff's records to suspected osteomyelitis, and the recommendation of the surgeons at John Cochran that plaintiff have continued antibiotic treatment particularly support the finding that the lack of effective antibiotic treatment specifically directed to the infections in plaintiff's pressure sores was negligent.
The two other related species of negligence involve delay in and lack of surgical consultation, both contrary to orders in plaintiff's chart. The first of the two, the 13-day delay in the surgical consult ordered May 23, is significant for the fact that only through surgical intervention was the large subcutaneous deposit of pus and stool in plaintiff's right thigh discovered and drained. This contributed to the advancement of the unchecked infection in plaintiff's hip wounds which ultimately reached his femurs and was a substantial factor in the necessity of amputation. The second failure in surgical consultation was the failure to return plaintiff to the surgical service for weekly follow-up evaluations, as ordered. The lack of surgical follow-up deprived plaintiff of the optimal wound management by surgical debridement, and contributed to the deterioration of his sores to a size and severity too great to permit healing.
The Court is not persuaded, however, that defendant is liable on the fourth basis urged by plaintiff, i.e., for the failure to use a Clinatron bed in the treatment of plaintiff. Although a Clinatron bed was recommended by the surgeons at John Cochran, the Court concludes based on the preponderance of the evidence that the use of other pressure reductive mattresses and techniques in the care of plaintiff constituted the medical equivalent of the Clinatron bed and was within the requisite standard of medical care. Neither is the Court persuaded that the failure to use that particular pressure reductive bed contributed in any substantial fashion to the deterioration of plaintiff's condition and the ultimate amputation of his legs.

B. Plaintiff's Contributory Fault

Defendant has urged that, in several ways, plaintiff's own negligence contributed *1412 to his injury, thereby proportionately reducing any liability of defendant. Comparative fault applies to medical malpractice claims under Missouri law. See § 538.230 R.S.Mo. (referring to apportionment of fault among the parties); see also Love v. Park Lane Medical Center, 737 S.W.2d 720, 723-25 (Mo. 1987). Defendant has presented evidence and argument concerning plaintiff's failure to use a Roho cushion on the trip which preceded his admission at Jefferson Barracks, his insistence on smoking cigarettes during his stay in the VA hospitals, and his non-compliance with his treatment regimen.
The Court finds that plaintiff's failure to use a Roho cushion on the trip substantially contributed to initially cause the hip and buttocks pressure sores with which he presented himself to Jefferson Barracks. At that time, plaintiff had been a paraplegic for more than twenty years, and was well familiar with the necessary means to attempt to prevent the development of pressure sores. On this point, the Court finds persuasive the reference in the medical records to plaintiff's admission that his own lack of good judgment in failing to use the Roho cushion was largely responsible for the development of the sores. Upon plaintiff's admission, the four hip and buttocks sores ranged as large as 12½ centimeters, and up to Grade III in severity. Although the negligence of the VA hospital staff in the subsequent treatment of the sores, as previously discussed, is the primary cause of plaintiff's ultimate injury, the Court nonetheless finds it reasonable to fix at 5% the contributory fault of plaintiff with regard to the initial development of the sores.
Defendant's evidence concerning plaintiff's cigarette smoking is also persuasive, consisting of the testimony of several witnesses, including the plaintiff, to the effect that plaintiff insisted on smoking while in the hospital, despite repeated medical advice against it. The testimony of several of defendant's medical witnesses concerning the deleterious effect of smoking on healing was not rebutted by plaintiff's evidence. The Court therefore concludes that plaintiff's smoking negligently and causally contributed to his ultimate injury, by contributing to the retardation of the healing of his wounds to the point that a serious infection set in. The Court fixes the percentage of plaintiff's contributory fault in this regard at 5%, finding that figure to be supported by the weight of the evidence on the issue.
As for plaintiff's occasional non-compliance as a patient, such as with turning in bed, etc., the Court finds that the evidence of such incidents is not substantial enough to support a finding of contributory fault and the fixing of any apportionment of liability therefor. This is particularly so in view of the existence of potentially counter-balancing testimony concerning the occasional failure of the VA medical staff to seek to turn plaintiff on the regular and frequent basis ordered in plaintiff's chart. In contrast with the undisputed evidence of plaintiff's continual smoking, the testimony concerning plaintiff's non-compliance in other respects is too episodic to demonstrate that the various incidents played a quantifiable role in the causation of plaintiff's ultimate injury.

II. Damages

A. Requirements of Missouri Law

Section 538.215.1 R.S.Mo. requires the trier of fact in a medical malpractice action to itemize damages according to the following categories, the terms of which are defined in § 538.205:
(1) Past economic damages arising from pecuniary harm, such as medical damages, lost wages, and lost earning capacity, which have accrued at the time the damages findings are made;
(2) Past noneconomic damages arising from nonpecuniary harm such as pain, suffering, mental anguish, inconvenience, physical impairment, disfigurement, loss of capacity to enjoy life, and loss of consortium, which have accrued at the time the damages findings are made;
(3) Future medical damages arising from reasonable expenses for necessary drugs, therapy, and medical, surgical, nursing, x-ray, dental, custodial and other health and rehabilitative services, which will accrue after the damages findings are made;

*1413 (4) Future economic damages, excluding future medical damages arising from pecuniary harm, such as lost wages and lost earning capacity, which will accrue after the damages findings are made; and
(5) Future noneconomic damages arising from nonpecuniary harm which will accrue after the damages findings are made.
In medical malpractice actions, the total of noneconomic damages (the sum of categories (2) and (5) above) is capped by § 538.210.1 R.S.Mo. The limitation is subject to annual revision. As calculated by the director of the division of insurance and published in the Missouri Register, Vol. 21, No. 6, p. 736 (March 15, 1996), the cap for 1996 is $492,000.00.

B. Economic Damages Other than Future Medical Expenses

Plaintiff's past economic damages consist in this case of medical expenses and lost wages. As indicated in the Court's findings of fact, the evidence supported the following medical expenses properly to be incorporated into the calculation of defendant's liability:

VA Medical Center charges for 5/9  7/19/91 $ 51,095.00
St. John's charges for 7/19  9/5/91 $108,719.89
St. John's charges for 9/5  9/23/91 $ 12,687.61
St. John's charges for 11/26  11/30/91 $ 5,891.41
 ___________
 $178,393.91

The Court notes the existence of a number of exhibits potentially relevant to plaintiff's past medical damages which were identified during trial but not admitted into evidence, and as to which either no testimony was elicited or the testimony was insufficient to establish the necessary causal connection with defendant's negligence. For example, although plaintiff's treating physician testified as to the reasonableness and medical necessity of recent care and treatment represented in a number of billing records, the exhibits were not admitted into evidence, the record does not contain the amounts of the billings, and the doctor was unable to testify conclusively that the care was necessitated by the VA's negligence or the amputation of plaintiff's legs.
Similarly, plaintiff's Exhibit 1 contains a list, generated by plaintiff's health insurer, of medical providers, dates of medical services rendered to plaintiff, and the charges for each. Although the government stipulated to the accuracy of the document as to the medical charges enumerated therein, plaintiff failed to adduce evidence establishing a causal link between any of the charges and the basis for the government's liability in this case, other than the charges of the VA Medical Center for the hospitalization here at issue. Without an adequate evidentiary basis for finding that the care rendered by a particular provider is attributable to the injuries caused by the government's negligence, the Court cannot include a particular medical expense in the judgment to be awarded to plaintiff; for example, the government would not properly be held responsible for medical expenses incurred by plaintiff if he were to break his finger or require root canal surgery. For these reasons, most of Exhibit 1 has not been shown to be relevant to the calculation of plaintiff's damages.
The other component of plaintiff's past economic damages is his lost wages. Plaintiff testified that at the time of his hospitalization in May, 1991, his weekly wage as a telephone operator was $459.50. The Court finds that the evidence as a whole, particularly the evidence concerning plaintiff's overall condition, independence, and activities prior to the hospitalization and amputations, reasonably supports a finding that, absent the injuries attributable to defendant's negligence, plaintiff could have continued to work in the same or similar capacity for an additional 21 years to age 62.
Defendant presented no evidence to challenge such a conclusion, and plaintiff presented no evidence concerning the probability of advancement or higher wages. On the record evidence, the Court thus finds that plaintiff's lost wages from May, 1991 for an additional 21 years total $501,774.00. Dividing this sum into past and future amounts, as required by § 538.215.1 R.S.Mo., the Court will award plaintiff $125,443.50 in past lost wages for the period from May, 1991 to date, and $376,330.50 for lost wages from the present to age 62.

C. Noneconomic Damages

The Court has given careful consideration to plaintiff's noneconomic damages. The *1414 facts of this case and the nature of plaintiff's resulting injuries are such that the attendant emotional and other hedonic injuries are among the most substantial which the Court has encountered. Plaintiff's physical impairment and disfigurement, two elements of noneconomic injury specifically enumerated in the statutory definition, are both obvious and great. As a result, plaintiff is largely immobilized and confined to life in one room. Plaintiff testified very credibly concerning his feelings of depression, helplessness and hopelessness, his embarrassment that he looks like a "freak," and the loss of relationships following his amputations.
The testimony of plaintiff, his family members and a friend amply demonstrated the extent to which, prior to the amputations, plaintiff was independent, highly social and extremely active, even though paraplegic. Based on his interviews with plaintiff, his family and friends, plaintiff's damages expert testified persuasively in support of his conclusion that the statistical degree of change in plaintiff's enjoyment of life was 87%  in other words, that plaintiff has lost 87% of his enjoyment of life. For all these reasons, and in view of the totality of the evidence, the Court finds that plaintiff's damages for pain, suffering, mental anguish, inconvenience, physical impairment, disfigurement and loss of capacity to enjoy life reasonably total $385,000.
Section 538.210.1 R.S.Mo. requires that the Court divide the total sum into past and future components. Using a life expectancy of 24 years from the time of trial, the ratio between the roughly five-year period from plaintiff's amputations to the present and the period from the present through the remainder of plaintiff's life expectancy is approximately 1 to 5. Nonetheless, because the Court finds it more likely than not that plaintiff suffered his noneconomic injuries most intensely in the period immediately following his amputations, while first trying to cope with his disfigurement, the Court fixes the percentage of plaintiff's noneconomic damages accrued at the time of this finding at 25% of the total, or $96,250, and the percentage of plaintiff's non-economic damages to be accrued after this finding at 75% of the total, or $288,750.

D. Future Medical Expenses

Finally, the largest component of the damages to be awarded plaintiff is his future medical expenses. In consultation with plaintiff's treating physician, plaintiff's damages expert prepared a "Life Care Summary" setting forth, by category, an itemized list and calculation of plaintiff's future medical expenses over his reasonable life expectancy of 24 years. Included are such categories as medical evaluations, medical tests, medications, therapies, attendant care, and medical supplies and equipment. The expert also prepared an addendum memorandum further explaining his basis for the inclusion of each item of cost.
The Court has carefully reviewed the summary and addendum, the testimony of plaintiff's expert explaining and defending them, and the testimony of defendant's expert challenging portions of the summary. Overall, the Court finds both the necessity and reasonableness of the costs itemized in the report to be supported by the record. The Court accepts in part and rejects in part the challenges of defendant's expert to particular items in the Life Care Summary. In addition, the Court has made determinations of its own that certain items of expense included in the summary are not appropriately charged to the government, for example, because the record does not support a finding that the expense is causally necessitated by the injuries plaintiff suffered as a result of defendant's negligence, as opposed to the plaintiff's preexisting medical condition. After making these revisions, the Court recalculates the total expenses appropriately contained in the Life Care Summary at $2,082,625.
Plaintiff's expert testified that the itemized summary of expenses represents only one of two options for plaintiff's future care, the other being residence in a skilled nursing facility. Under this second option, all of plaintiff's medical needs and expenses would be incurred in a single, albeit more expensive, payment. Testimony at trial indicated that plaintiff's treating physician and nurses *1415 were of the opinion that residence in a skilled nursing facility was more appropriate for plaintiff's condition at that time than his current system of in-home care. The record contains no explanation for the fact that plaintiff nonetheless continued to reside in his own home, which may in fact be plaintiff's preference despite the recommendation of his doctor and nurses. The record was equally insubstantial concerning the likelihood that future changes in plaintiff's condition would require admission to a skilled nursing facility. For these reasons, the Court is not persuaded that the more expensive estimate of the cost of such treatment should be taken into account in calculating plaintiff's future medical expenses, which are in any event substantial. The Court therefore deems it reasonable to fix the amount of plaintiff's future medical damages at $2,082,625, a figure representing the portion of the Life Care Summary reasonably supported by the evidence as medically necessary and causally related to defendant's negligence.

E. Total Damages

In view of the Court's assessment of 10% contributory fault to plaintiff, the Court reduces the total amount of plaintiff's damages by that proportion. As previously noted, the government is not subject under the FTCA to the payment of prejudgment interest. See 28 U.S.C. § 2674.
Based on the foregoing findings of fact and conclusions of law, the Court finds in favor of plaintiff and against defendant on plaintiff's FTCA claim and assesses plaintiff's damages in the following amounts, here itemized pursuant to § 538.215.1 R.S.Mo.:

 Past economic damages: $ 303,837.41
 Past noneconomic damages: $ 96,250.00
 Future medical damages: $2,082,625.00
 Future economic damages, excluding $ 376,330.50
 future medical damages:
 Future noneconomic damages: $ 288,750.00
 _____________
 $3,147,792.91
 Minus 10% for plaintiff's contributory - 314,779.29
 fault:
 _____________
 TOTAL DAMAGES $2,833,013.62

F. Periodic Payments

Section 538.220.2 R.S.Mo. authorizes the Court to require that "future damages be paid in whole or in part in periodic or installment payments if the total award of damages in the [medical malpractice] action exceeds one hundred thousand dollars." The provision mandates that the Court impose such a requirement if requested by any party prior to the entry of judgment. Furthermore:
Any judgment ordering such periodic or installment payments shall specify the recipient, the amount of each payment, the interval between payments, and the number of payments. The parties shall be afforded the opportunity to agree on the manner of payment of future damages, including the rate of interest, if any, to be applied, subject to court approval. However, in the event the parties cannot agree, the unresolved issues shall be submitted to the court for resolution, either with or without a post-trial evidentiary hearing. ...
§ 538.220.1 R.S.Mo.
The statute further provides that, upon the plaintiff's death, the right to receive future medical expenses ceases, except to the extent necessary to satisfy medical expenses due and owing at that time. See § 538.220.5 R.S.Mo. The right to receive other types of future damages by way of periodic payments shall "pass in accordance with the Missouri probate code unless otherwise transferred or alienated prior to death." Id. These provisions sensibly protect against the possibility of a windfall to plaintiff's heirs in the event that his life expectancy is considerably less than has been found by the Court as a basis for calculating his damages. Particularly in view of the amount of the future medical damages fixed by the Court, and the fact that the judgment will be paid at the expense of the taxpayers, the Court is inclined to the view that periodic payments of the future medical damages are appropriate.
For these reasons, the Court will defer the entry of judgment to allow either party to file a motion invoking the periodic payment provisions, and to allow the parties time in which to attempt to reach agreement concerning the logistics of a periodic payment plan. Within ten days, the parties shall file either a motion or motions requesting the imposition of a periodic payment schedule, or a joint memorandum advising the Court that *1416 neither party desires that a periodic payment schedule be employed in this case. In the event that a motion invoking § 538.220.2 is filed by either party, the parties will have thirty days from the date of this order in which to file a memorandum setting forth the terms jointly agreed to by them concerning periodic payments. The parties should be aware that, even in the absence of a request by one of them, the Court may in the exercise of its discretion impose a periodic payment schedule, unless good cause is shown why doing so would not be appropriate.
To encourage the parties in a reasonable exercise of their judgment concerning a proposed payment schedule, the Court here notes some of the considerations relevant to the formulation of an appropriate schedule. First, "all past damages must be paid in a lump sum at the time of judgment." Vincent v. Johnson, 833 S.W.2d 859, 866 (Mo.1992). The designated payee and the number, amount, and frequency of payments must all be specified in the judgment. See § 538.220.2. As the statute itself suggests, interest on the amount of future damages to be paid over time is an appropriate consideration. In this regard, the Missouri Supreme Court has advised that "in determining the appropriate rate of interest, the court should consider what would constitute prudent investment, beginning with the rate of return on equivalent long-term investments...." Vincent, 833 S.W.2d at 867. Because the judgment debtor is the United States, the Court would not likely require the posting of security as provided for in § 538.220.3.
As suggested in § 538.220.4, the payment of attorney's fees must be taken into account in fixing the presumably sizeable lump sum payable at the time the judgment becomes final, which may include a significant portion of the future damages in addition to all past damages. See id. at 866 ["[I]t is presumed that, absent the attorney's agreement, attorney's contingent fees will be paid at the time of judgment."]; see also § 538.220.2 R.S.Mo. [referring to a requirement that "future damages be paid in whole or in part in periodic or installment payments" (emphasis added)]. Funds for payment of plaintiff's attorney's fees must therefore be available from the initial payment and should not be subject to payment over time under the schedule to be imposed. The Court is also inclined to the view that the periodic payments should not stretch over the entire life expectancy of the plaintiff. Counsel are encouraged to bear in mind all these and other relevant considerations in attempting to formulate an appropriate periodic payment schedule.
Accordingly,
IT IS HEREBY ORDERED that, within ten (10) days of the date of this order, the parties shall file either: (1) a motion or motions requesting the imposition of a periodic payment schedule, or (2) a joint memorandum advising the Court that neither party desires that a periodic payment schedule be employed in this case. In the event that a motion invoking § 538.220.2 is filed by either party, the parties shall file, no more than thirty (30) days from the date of this order, a memorandum setting forth the terms jointly agreed to by them concerning periodic payments.
IT IS FURTHER ORDERED that the entry of judgment will be deferred pending the Court's consideration of the imposition of a periodic payment schedule for all or part of plaintiff's future damages.
*1417