*Joao Barbosa, et ux. v. Tanisha Osbourne*, No. 1258, September Term, 2015, filed:  April 26, 2018
  Opinion by Krauser, J.

**MEDICAL MALPRACTICE — NATURE OF ACTION — NEGLIGENCE:**  To succeed on a claim of medical malpractice, the plaintiff must show that the physician's conduct—the care given or withheld by the doctor—was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the act (or omission) giving rise to the cause of action.  Because a medical malpractice action is tortious in nature, general rules of negligence usually apply in determining liability.

**MEDICAL    MALPRACTICE    —    AVAILABILITY    OF    AFFIRMATIVE DEFENSES:**  A defendant health care provider may raise, in a medical malpractice case, any of the affirmative defenses generally available in any negligence action, including contributory negligence.

**MEDICAL MALPRACTICE — CONTRIBUTORY NEGLIGENCE OF PATIENT:** Generally, a plaintiff's purported contributory negligence may not be invoked as a defense in a negligence action unless there is some evidence that the injured party acted, or failed to act, with knowledge and appreciation, either actual or imputed, of the danger of injury which his conduct involves.  As applied to a medical malpractice action, that rule permits a contributory negligence defense, where there was evidence adduced that the plaintiff had received treatment from a health care provider, that he had then been given instructions by that provider, and that he had not followed, or unreasonably delayed in following, those instructions.

**MEDICAL MALPRACTICE — CONTRIBUTORY NEGLIGENCE OF PATIENT — PATIENT'S PRE-TREATMENT CONDUCT:**  The pre-treatment conduct of a patient is irrelevant in determining whether a physician is liable for violating the standard of care in rendering medical services to that patient.

**MEDICAL MALPRACTICE — CONTRIBUTORY NEGLIGENCE OF PATIENT — PATIENT'S PRE-TREATMENT CONDUCT:**  In this case, the circuit court erred in permitting Dr. Osbourne to pursue a defense of contributory negligence based solely upon Mr. Barbosa's pre-treatment conduct, and it compounded that error in giving a contributory negligence instruction to the jury, as well as in providing the jury with a special verdict sheet, setting forth that defense.

**CIVIL PROCEDURE — VERDICT SHEETS — HARMLESS ERROR:**  A circuit court may require a jury to return a verdict in the form of written findings upon specific issues and shall instruct the jury as may be necessary to enable it to make its findings.  A verdict returned in that form may be sustained on appeal even though the trial court

erroneously admitted or excluded evidence or argument, so long as the error was harmless; reversal is required only if it was more likely than not that the error influenced the verdict.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1258

September Term, 2015

_____

JOAO BARBOSA, *et ux.*

v.

TANISHA OSBOURNE

_____

Woodward, C.J.,
Friedman,
*Krauser,

JJ.

_____

Opinion by Krauser, J.
_____

Filed: April 26, 2018

*Krauser, Peter B., J., now retired, participated in the hearing of this case while an active member of this Court, and as its Chief Judge; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the preparation of this opinion.

Appellants, Joao Barbosa and Angela Barbosa, brought a medical malpractice action, in the Circuit Court for Frederick County, against appellee, Tanisha M. Osbourne, M.D., alleging that she had, in the course of surgically removing Mr. Barbosa's inflamed gallbladder, negligently cut Mr. Barbosa's bile duct. In response, Dr. Osbourne denied any negligence in the performance of that procedure and further invoked, as a defense, Mr. Barbosa's purported contributory negligence in failing to timely seek treatment for his severe abdominal pains, which, she maintained, clearly signaled the medical problem for which he eventually sought treatment. The validity of the latter defense is the pivotal issue of this appeal.

At the conclusion of the trial below, the jury, after receiving an oral instruction and a special verdict sheet, indicating that contributory negligence was a defense to the Barbosas' claims, did not find that Dr. Osbourne had breached the standard of care, without reaching the question of whether Mr. Barbosa had been contributorily negligent. The Barbosas then noted this appeal, contending that, because Mr. Barbosa's alleged negligence preceded any medical treatment that Mr. Barbosa received from Dr. Osbourne or any other health care provider, Dr. Osbourne's contributory negligence defense had no basis in the law. And, furthermore, they claim that the court's error, in permitting that defense to be raised at every stage of the trial, from opening statement to closing argument, and then in providing the jury with a special verdict form setting forth contributory negligence as a potential defense, cannot be deemed harmless error, as Dr. Osbourne claims.

For the reasons that follow, we shall reverse the judgment below and remand for further proceedings.

## I

On June 12, 2013, Mr. Barbosa, after experiencing "severe" and persistent abdominal pain throughout the day, went to the emergency room of the Frederick Memorial Hospital. There, Mr. Barbosa was seen by a nurse, who completed a "triage assessment" form, noting that he had arrived at the emergency room, complaining of "diffuse" abdominal pain. That assessment was reviewed by an emergency room physician, who then ordered several laboratory tests for Mr. Barbosa. While the performance of those tests was still pending, Mr. Barbosa left the hospital, as he had waited for over two hours to be seen by a doctor, without success, and his pain had diminished. The discharge assessment form that memorialized his emergency room visit stated that his "Departure Disposition" was "Elop[e]ment (Patient Not Seen)" and that the priority assigned to his case was "Non-Urgent."

After leaving the emergency room, Mr. Barbosa continued to experience abdominal pain, and, that evening, he had trouble eating and sleeping. The following day, a nurse at Frederick Memorial Hospital telephoned Mr. Barbosa and left a message on his voice mail, "requesting" that he "call back or return" to the hospital "for questions, concerns[,] or if [his] condition changes." Notably, there was no suggestion that he otherwise call back or return to the hospital.

In any event, Mr. Barbosa did not remember receiving such a call, but, nonetheless, returned to the emergency room eleven days after having left it, complaining that his abdominal pain had worsened and that he was having difficulties in sleeping, eating, and working. At that time, he was seen by an emergency room physician, who performed an ultrasound scan. The scan indicated that Mr. Barbosa was suffering from, among other things, an inflamed gallbladder and possibly gallstones. When Dr. Osbourne was notified by telephone of those findings, she advised the emergency room physician to admit Mr. Barbosa to the hospital overnight, as she planned "to see him in the morning."

The next day, Dr. Osbourne examined Mr. Barbosa and confirmed the preliminary results of the ultrasound scan, namely, that he was suffering from inflammation of the gallbladder and possibly from gallstones in both his bile and cystic ducts. Dr. Osbourne, then, met with Mr. Barbosa and his wife to discuss treatment options; at which time, the doctor recommended that Mr. Barbosa undergo a laparoscopic procedure[1] to remove his gallbladder and a cholangiography, to obtain a radiographic image of his bile duct. Mr. Barbosa consented to the proposed surgery and cholangiography.

As Dr. Osbourne began the surgery that day, she observed "adhesions," that is, "intense scarring," on the gallbladder and surrounding structures below the liver. Those adhesions had caused what were "normally separate anatomical structures," such as Mr. Barbosa's colon and gallbladder, to bind together. When Dr. Osbourne attempted to cut

---

[1] Laparoscopy is the use of a "slender, tubular" instrument that is "inserted through an incision in the abdominal wall to examine or perform minor surgery." *Stedman's Medical Dictionary* 151, 453 (2001).

away the adhesions, she encountered difficulty in doing so and, consequently, sought the assistance of a more senior surgeon, Jonathan E. Grife, M.D. After discussing the problem with Dr. Grife, Dr. Osbourne decided not to perform the cholangiography, as planned, because she believed that the adhesions had rendered that procedure unsafe and unnecessary. Then, assisted by Dr. Grife, Dr. Osbourne commenced the surgical removal of Mr. Barbosa's gallbladder.

Upon removing the gallbladder, Dr. Osbourne observed a small amount of bile, which, in her words, was "where it shouldn't be." Suspecting a possible bile duct injury, she requested that a gastroenterologist perform an endoscopic examination, known as an "ERCP,"[2] so that Mr. Barbosa's bile duct could be inspected and a determination made as to the extent of any such injury. When, after multiple attempts, the requested gastroenterologist was unable to perform that diagnostic procedure, Mr. Barbosa was transferred to the University of Maryland Medical Center, where an ERCP was successfully performed, confirming damage to the bile duct.

At the Medical Center, Mr. Barbosa then underwent a surgical procedure to repair his bile duct injury, during the course of which his right hepatic artery ruptured, whereupon a section of that artery was removed and replaced. A subsequent "Operative Report," from the University of Maryland Medical Center, stated that the repair of the artery "revealed an underlying thermal injury involving over 50% of the right hepatic artery diameter," which, the Barbosas later claimed, was caused by the instrument Dr. Osbourne used to remove his

---

[2] "ERCP" is an acronym for "endoscopic retrograde cholangiopancreatography."

4

gallbladder. On July 2, 2013, Mr. Barbosa was discharged from the University of Maryland Medical Center and returned home.

## II

Mr. and Mrs. Barbosa thereafter filed a claim with the Health Care Alternative Dispute Resolution Office, alleging medical malpractice by Dr. Osbourne. Then, after arbitration was waived, the Barbosas filed suit against Dr. Osbourne, in the Frederick County circuit court, alleging both medical malpractice and loss of consortium.[3] In her answer to the Barbosas' complaint, Dr. Osbourne asserted that she had not breached the standard of care and that, in any event, Mr. Barbosa had been contributorily negligent in leaving the emergency room on June 12, 2013, without having received a diagnosis, and then not returning to that medical facility until eleven days later. That delay, the doctor claimed, severely complicated the surgery she was to perform.[4]

To prevent the implementation of that defense, the Barbosas filed a pre-trial "Motion for Summary Judgment as to the Defendants' Affirmative Defense of

---

[3] The Barbosas also filed claims against defendants Jonathan E. Grife, M.D., as well as Stephen J. McKenna, L.L.C., Dr. Osbourne's purported employer, and arbitration was likewise waived as to those claims. Several months after the complaint was filed in the circuit court, the claims against Stephen J. McKenna, L.L.C., were dismissed from the case, as were the claims against Dr. Grife, on the eve of trial, pursuant to a settlement agreement between Grife and the Barbosas.

[4] The Barbosas subsequenty filed an amended complaint, which merely supplemented the factual basis of their claims, and, in response, Dr. Osbourne filed an answer, raising, once again, among other defenses, contributory negligence.

5

Contributory Negligence," contending that such a defense cannot be raised as to a patient's delay in seeking treatment that precedes any medical diagnosis, care, or treatment the patient ultimately receives, which, they maintained, is precisely what occurred here. The circuit court denied that motion as well as the motion for reconsideration that followed.

At trial, in addition to the extensive testimony from medical expert witnesses presented by both sides, as to whether Dr. Osbourne had violated the standard of care, Dr. Osbourne's counsel vigorously pursued a contributory negligence defense. She raised that defense in opening statement, then cross-examined lay and expert witnesses presented by the Barbosas as to that issue, then presented three medical experts, all of whom testified as to Mr. Barbosa's alleged contributory negligence, and finally, raised contributory negligence as a defense in closing argument.

Illustrative of the spirited pursuit of that defense by Dr. Osbourne's counsel is her closing argument, where she maintained that, had Mr. Barbosa remained in the emergency room the evening of June 12th, "the injuries we are here for today would not have existed." Then, in stressing to the jury why the date of "June the 12th" was "important to the case," she asserted that Mr. Barbosa, on that date, failed to remain in the emergency room and obtain a diagnosis of or treatment for his abdominal pain; then failed to return to the hospital on June 13, 2013, in response to the telephonic voice message left by a hospital nurse; and, then, delayed his return to the emergency room for treatment for ten more days despite continuing to experience abdominal pain during that time period; all of which was, purportedly, evidence of contributory negligence.

6

At the conclusion of the trial, the circuit court instructed the jury, not only as to negligence, but as to contributory negligence as well, stating:

> The patient cannot recover if the patient's negligence is the cause of the injury. Negligence, again, is doing something a person using ordinary care would not do, or not doing something a person using ordinary care would do. "Ordinary care" means that caution, attention, or skill a reasonable person would use under similar circumstances.
>
> The Defendant has the burden of proving, by a preponderance of the evidence, that [the] patient's negligence was the cause of the patient's injury.

Then, before the jury commenced its deliberations, it was given a special verdict sheet, which instructed that, if it answered "Yes" to "Question 1" of the verdict sheet: "Do you find by a preponderance of the evidence that Defendant, Tanisha M. Osbourne, M.D., deviated from the accepted standard of care in her treatment of Joao M. Barbosa?", it must proceed to "Question 2," which asked: "Do you find by a preponderance of the evidence that the deviation from the accepted standard of care by the Defendant, Tanisha M. Osbourne, M.D., was a cause of injury to Joao M. Barbosa?" And, if it answered "Yes," it was to proceed to "Question 3," which inquired: "Do you find that Plaintiff Joao M. Barbosa's own negligence in caring for himself caused or contributed to his injuries?" On the other hand, if, at the outset, it answered "No" to Question 1, it was to "STOP and notify the court that [it had] reached a verdict."

Ultimately, the jury answered "No" to the first question on the verdict sheet and thereby indicated that it had not found by a preponderance of the evidence that Dr. Osbourne had "deviated from the accepted standard of care in her treatment of Joao M.

7

Barbosa." Accordingly, "Question 3," inquiring whether Mr. Barbosa's "own negligence in caring for himself caused or contributed to his injuries," was not reached, by the jury, on the verdict sheet.

Following entry of judgment in favor of Dr. Osbourne, the Barbosas filed a motion for new trial on several grounds, including that Dr. Osbourne's contributory negligence defense was not only improper but prejudicial. The circuit court denied that motion, prompting the Barbosas to note this appeal.

## III

To succeed on a claim of medical malpractice, "the plaintiff must show that the physician's conduct—the care given or withheld by the doctor—was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the act (or omission) giving rise to the cause of action." *Dingle v. Belin*, 358 Md. 354, 368 (2000). *See also* Maryland Code (1974, 2013 Repl. Vol.), § 3-2A-02(c) of the Courts and Judicial Proceedings Article. A medical malpractice action is "tortious in nature," and, therefore, "general rules of negligence usually apply in determining liability." *Dehn v. Edgecombe*, 384 Md. 606, 618 (2005).

But, although a defendant health care provider may raise, in a medical malpractice case, any of the affirmative defenses generally available in any negligence action, including contributory negligence, that defense may not be invoked unless there is some evidence "that the injured party acted, or failed to act, with knowledge and appreciation, either actual

8

or imputed, of the danger of injury which his conduct involves." *Thomas v. Panco Mgmt. of Maryland, LLC*, 423 Md. 387, 418 (2011) (internal citations and quotation marks omitted).  As that issue poses a question of law, this Court must review it *de novo*.  *Hall v. Univ. of Maryland Med. Sys. Corp.*, 398 Md. 67, 82 (2007); *Copsey v. Park*, 228 Md. App. 107, 119 (2016), *aff'd*, 453 Md. 141 (2017).

**IV**

As noted, the Barbosas contend that the trial court erred in permitting Dr. Osbourne to raise a contributory negligence defense at each stage of trial; then, in instructing the jury that contributory negligence was a defense to the Barbosas' malpractice claim; and, finally, in providing a verdict sheet presenting that defense for its consideration.

Our appellate courts have upheld the submission of a contributory negligence issue to a jury, in medical malpractice cases, but only where there was evidence adduced that the plaintiff had received treatment from a health care provider, that he had then been given instructions by that provider, and that he had not followed, or unreasonably delayed in following, those instructions.  *See*, *e.g.*, *Moodie v. Santoni*, 292 Md. 582, 591 (1982) (holding that the issue of contributory negligence was properly submitted to the jury, where the physician had prescribed a drug treatment for the plaintiff's tuberculosis and stressed the importance of reporting any symptoms related to side effects, but the plaintiff had purportedly failed to do so and subsequently died of that disease); *Hopkins v. Silber*, 141 Md. App. 319, 325, 331 (2001) (holding that the issue of contributory negligence was properly submitted to the jury, where, after the plaintiff had penile implants surgically

9

implanted and was advised by his surgeon to refrain from sexual intercourse for the next six weeks, he had ignored that advice and subsequently suffered resultant complications); *Kassama v. Magat*, 136 Md. App. 637, 647, 663 (2001) (holding that the issue of contributory negligence was properly submitted to the jury, where the pregnant plaintiff ignored her obstetrician's instruction to obtain, "as soon as possible," a test to detect a genetic defect in her fetus, and subsequently her child was born with Down's Syndrome), *aff'd*, 368 Md. 113 (2002); *Smith v. Pearre*, 96 Md. App. 376, 394 (1993) (upholding a jury instruction "that, if a patient is told by the doctor to return and fails to [do so], then he may be charged with contributory negligence; if the doctor does not tell a patient to return, then the patient is not contributorily negligent"); *Myers v. Estate of Alessi*, 80 Md. App. 124, 133 (1989) (holding that the issue of contributory negligence was properly submitted to the jury, where the plaintiff had visited her physician, complaining of a sore throat, and then been advised, by him, to return if her condition did not improve, but did not do so for six months, by which time she was suffering from cancer of the tongue); *Chudson v. Ratra*, 76 Md. App. 753, 773 (1988) (holding that the issue of contributory negligence was properly submitted to the jury, where the plaintiff had felt a lump on her right breast, was "under specific and repeated instructions" from her physician "to report back if the lump she felt did not disappear," but she did not do so and thereafter died of breast cancer).

The instant case, however, presents the inverse of what occurred in the aforesaid cases, where a physician had treated and advised a patient, and, thereafter, the patient had disregarded the physician's instructions. That is to say that, here, we are confronted with the question of whether a physician, who had not yet treated or even seen the plaintiff,

10

when the alleged contributory negligence occurred, can raise that purported negligence as a defense.

Although that issue has never been expressly addressed by our appellate courts, there is, in *Santoni v. Moodie*, 53 Md. App. 129 (1982), *cert. denied sub nom. Jacobson v. Santoni*, 295 Md. 526 (1983), *cert. denied*, 295 Md. 527 (1983), more than a hint that the answer to that question is "No." When medical tests administered to Mario Santoni indicated "that he had been exposed to tubercle bacilli at some time in his life" and thus "was at a greater risk of developing" tuberculosis, he was referred to the Baltimore City Health Department, where he was enrolled in a drug treatment and monitoring program for that disease, under the supervision of two Health Department physicians, Allan H. Moodie, M.D., and Meyer W. Jacobson, M.D. *Id.* at 132-33. When Mr. Santoni subsequently died of hepatitis, a side effect of his drug treatment regimen, his widow and the personal representative of his estate brought a medical malpractice action against Drs. Moodie and Jacobson. *Id.* at 130, 133.

At the trial that ensued, the physicians successfully interposed a contributory negligence defense, claiming that, after the Health Department had emphasized to Mr. Santoni the importance of reporting any side effects from the drug he had been given, he had failed to do so. *Id.* at 135. However, on appeal, Santoni's estate claimed that the trial court had erroneously excluded testimony about a conversation between Santoni and his wife, indicating that he was not aware of any risks associated with his treatment and thus could hardly have been contributorily negligent as to risks he did know of. *Id.* at 140.

11

In examining the close relationship between foreseeability of harm and contributory negligence, we declared that, "[t]o be held contributorily negligent, a person must actually have been aware of or should have appreciated the risks involved and then failed to exercise reasonable and ordinary care for his own safety." *Id.* at 137. Then, observing that courts have recognized the "disparity between the knowledge and skill of a doctor and that of a patient" and that a "patient is not in a position to diagnose his own ailment," we avowed that "it is not contributory negligence for a patient . . . to fail to consult another doctor when the patient has no reason to believe that the doctor's negligence has caused his injury, or to fail to diagnose his own illness[.]" *Id.* at 138 (internal citations omitted). Consequently, as the excluded testimony "tended strongly to prove" that Mr. Santoni "had no foreseeability of harm," *id.* at 136, we held that its exclusion by the trial court was prejudicial error, reversed the judgment in favor of Drs. Moodie and Jacobson, and remanded for a new trial. *Id.* at 150-51.

Because *Santoni* applied the principle that "it is not contributory negligence for a patient . . . to fail to diagnose his own illness" in a different context, where the plaintiff was already under a physician's care and his purported contributory negligence occurred when he allegedly disregarded the physician's instructions, the same principle should apply, *a fortiori*, where, as in the instant case, the plaintiff's purported contributory negligence occurred before he ever received either a diagnosis of or treatment for his condition.

In any event, while no Maryland appellate court has directly addressed this precise issue: whether the purported negligence of a patient plaintiff, which precedes any medical treatment, may be raised as a defense of contributory negligence, by a physician that

12

subsequently treats that individual, Section 7 of the *Restatement* (*Third*) *of Torts*:

*Apportionment of Liability* (2000), and the appellate courts of many other states have.

Comment m to Section 7 of the Third Restatement states that:

> in a case involving negligent rendition of a service, including
> medical services, a factfinder does not consider any plaintiff's
> conduct that created the condition the service was employed to
> remedy.

Moreover, state appellate courts in both contributory negligence[5] and comparative

negligence[6] jurisdictions agree that the pre-treatment negligence of a patient is irrelevant

---

[5] The following decisions, holding that a plaintiff's pre-treatment conduct, which created the condition the physician was employed to treat, did not amount to contributory negligence, were rendered in contributory negligence jurisdictions: *Cavens v. Zaberdac*, 849 N.E.2d 526 (Ind. 2006) (Indiana's comparative negligence statute expressly exempts medical malpractice actions from its scope, *id.* at 529 (citing Ind. Code § 34-51-2-1), hence the traditional contributory negligence rule applies); *Nelson v. McCreary*, 694 A.2d 897 (D.C. 1997); *Eiss v. Lillis*, 357 S.E.2d 539 (Va. 1987).

[6] The following decisions, holding that a plaintiff's pre-treatment conduct, which created the condition the physician was employed to treat, did not amount to contributory negligence, were rendered in comparative negligence jurisdictions: *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121 (Tenn. 2004); *Rowe v. Sisters of the Pallottine Missionary Soc'y*, 560 S.E.2d 491 (W.Va. 2001); *Harding v. Deiss*, 3 P.3d 1286 (Mont. 2000); *Jensen v. Archbishop Bergan Mercy Hospital*, 459 N.W.2d 178 (Neb. 1990); *Fritts v. McKinne*, 934 P.2d 371 (Okla. Civ. App. 1996); *Martin v. Reed*, 409 S.E.2d 874 (Ga. Ct. App. 1991); *Owens v. Stokoe*, 485 N.E.2d 537 (Ill. App. Ct. 1985); *Whitehead v. Linkous*, 404 So. 2d 377 (Fla. Dist. Ct. App. 1981); *Sendejar v. Alice Physicians & Surgeons Hosp. Inc.*, 555 S.W.2d 879 (Tex. Civ. App. 1977); *Harvey v. Mid-Coast Hosp.*, 36 F. Supp. 2d 32 (D. Me. 1999) (forecasting Maine law).

One of the few state appellate decisions, which we have found, that rejects the rule of Section 7 of the Restatement, is *Shinholster v. Annapolis Hosp.*, 685 N.W.2d 275 (Mich. 2004). There, in rejecting the logic of Comment m to Section 7, the Supreme Court of Michigan expressly recognized that its decision was contrary to the overwhelming consensus of other state courts that have considered the issue. But, it explained, its holding was compelled by "the specific language of" its comparative negligence statute. *Id.* at
(continued)

in determining whether a physician is liable for violating the standard of care in rendering medical services to that patient. The reasoning of two of those decisions—*Jensen v. Archbishop Bergan Mercy Hospital*, 459 N.W.2d 178 (Neb. 1990), and *Cavens v. Zaberdac*, 849 N.E.2d 526 (Ind. 2006)—we believe to be particularly relevant to the instant case. *Jensen* was decided under a now obsolescent comparative fault regime, known as the "slight-gross" comparative fault rule,[7] according to which the fault of the plaintiff and the fault of the defendant are compared only if the plaintiff's negligence is "slight" and the defendant's negligence is "gross." Otherwise, the plaintiff is barred from recovery (as would be the case under Maryland law). *See* Neb. Rev. Stat., § 25-21,185 (applying the "slight-gross" comparative fault rule to "all actions accruing before February 8, 1992, brought to recover damages for injuries to a person or to property caused by the negligence or act or omission giving rise to strict liability in tort of another"). The other case, *Cavens*, was decided under the traditional common law contributory negligence rule.[8]

In *Jensen*, the decedent, Lawrence Jensen, had been a patient of Richard E. Peters, M.D., since 1976 and had been treated for various illnesses, including thrombophlebitis, a

---

281-82 n.8. *See also Wyatt v. United States*, 939 F. Supp. 1402, 1412 (E.D. Mo. 1996) (reaching a similar holding under Missouri's comparative negligence statute). We, of course, are not constrained by the specific language of any statute in deciding this issue.

[7] Currently, only one state, South Dakota, adheres to the "slight-gross" comparative fault rule. *Dodson v. South Dakota Dept. of Human Services*, 703 N.W.2d 353, 356 (S.D. 2005).

[8] Although Indiana had legislatively adopted comparative negligence, that legislation did not and still "does not apply to actions for medical malpractice." *Cavens*, 849 N.E.2d at 529 (citing Ind. Code § 34-51-2-1).

14

condition involving blood clots in a vein. *Jensen*, 459 N.W.2d at 180. In 1978, Dr. Peters advised Jensen, "who weighed 291 pounds, to lose weight." *Id.*

In January 1983, Jensen was injured in a sledding accident "and sustained a compression fracture of a lumbar vertebra," prompting him to be admitted to Archbishop Bergan Mercy Hospital ("Bergan Mercy") under Dr. Peters's care. *Id.* He was hospitalized for fifteen days and, during his stay, was treated with an anticoagulant drug for his thrombophlebitis. At that time, Jensen still weighed 290 pounds. *Id.* Then, several weeks later, he was re-admitted to the hospital, "complain[ing] of pain in the calf and thigh area of his left leg." *Id.* Dr. Peters diagnosed Jensen's condition as "acute thrombophlebitis" and treated him with an anticoagulant drug. *Id.* Nonetheless, Jensen "continued to have pain in his left thigh," discomfort in "his right chest area," and nausea. *Id.* Then, six days after being re-admitted to the hospital, Jensen went into cardiac arrest, and Dr. Peters, upon being notified of Jensen's condition by an attending nurse, rushed to the hospital. *Id.* Shortly after the doctor arrived, Jensen "died from cardiac arrest due to pulmonary embolism." *Id.*

The administrator of Jensen's estate thereafter brought a medical malpractice action against Bergan Mercy, alleging that the hospital had been negligent in failing to do the following: monitor Jensen's condition; inform Dr. Peters concerning the details of Jensen's condition; treat Jensen properly; and obtain professional medical care for Jensen, immediately before his death. *Id.* During the ensuing trial, Bergan Mercy not only denied any negligence, but raised a contributory negligence defense, based upon Jensen's "disregard of his physician's recommendation" to lose weight. *Id.* at 184. Over objection,

15

the trial court instructed the jury that "Defendant alleges that the injuries, complications and subsequent death of Mr. Jensen were partially due to his own negligence which caused and contributed to cause said injuries and complications and death, and whose negligence was more than slight and sufficient to bar recovery." *Id.* at 181. Following a jury verdict in favor of Bergan Mercy, the administrator of Jensen's estate appealed.

The Supreme Court of Nebraska reversed.[9] In so ruling, the court observed that, "[g]enerally, the defense of contributory negligence has been recognized in a medical malpractice action when the patient has (1) failed to follow a medical instruction, (2) refused or neglected prescribed treatment, or (3) intentionally given erroneous, incomplete, or misleading information which is the basis for medical care or treatment of the patient," *id.* at 184, which is consistent with Maryland law. *See*, *e.g.*, *Moodie*, *supra*, 292 Md. at 591; *Dehn v. Edgecombe*, 152 Md. App. 657, 671 (2003), *aff'd*, 384 Md. 606 (2005); *Santoni*, *supra*, 53 Md. App. at 138. The Nebraska court then went on to explain that the "availability of a contributory negligence defense in a malpractice case is limited because of the disparity in medical knowledge between the patient and his doctor and because of the patient's right to rely on the doctor's knowledge and skill in the course of medical treatment."[10] *Jensen*, 459 N.W.2d at 184 (citation and quotation omitted). And, as a consequence, "many courts have held," Nebraska's highest court noted,

> that the defense of contributory negligence in a medical malpractice action is inapplicable when a patient's conduct

[9] At that time, Nebraska did not have an intermediate appellate court.

[10] The quoted language is nearly identical to what we said in *Santoni v. Moodie*, *supra*, 53 Md. App. at 138.

16

> provides the occasion for medical attention, care, or treatment which later is the subject of a medical malpractice claim or when the patient's conduct contributes to an illness or condition for which the patient seeks the medical attention, care, or treatment on which a subsequent medical malpractice claim is based.

*Id.* at 184-85. Then, employing that rule, the Nebraska court concluded that Jensen's failure to lose weight, and, indeed, "[a]ny conduct on [his] part before he was admitted to Bergan Mercy and which may have causally contributed to his demise," was "not a proximate cause in reference to alleged malpractice in medical treatment at Bergan Mercy." *Id.* at 187. And, because "there was no evidence to support a finding of contributory negligence," the Nebraska Supreme Court held that "it was prejudicial error to submit the issue" to the jury and therefore reversed and remanded the case for a new trial. *Id.*

In the instant case, Mr. Barbosa's alleged failure to act upon the boilerplate telephone call he purportedly received, the day after his first emergency room visit, which did not advise him to return to the hospital but only suggested that he do so "if [his] condition changes," was certainly less of a failure to adhere to a care provider's admonition than Jensen's declining to follow his doctor's advice to lose weight. In any event, it was not, in the *Jensen* Court's words, "a failure to follow the treating physician's specific instructions in the patient's care and treatment" and consequently was of no consequence. *Id.* at 184. Moreover, although Mr. Barbosa's purported negligence, in leaving the emergency room and not returning for eleven days, may have led to the growth of adhesions that made his gallbladder surgery more difficult than if he had undergone surgery without delay, just as Jensen's failure to lose weight may have been "causally related to his

17

pulmonary embolism," Mr. Barbosa's delay in seeking medical treatment was plainly not a proximate cause of the injury he sustained as a result of the medical malpractice that allegedly ensued. *Id.* at 187.

The second of the two cases, whose reasoning we find compelling, is *Cavens v. Zaberdac*, *supra*, 849 N.E.2d 526. There, the decedent, Peggy Miller, had suffered from "severe and persistent asthma," for which she was receiving treatment from a physician, Mary E. Strek, M.D., who was not named as a defendant in that matter. *Cavens*, 849 N.E.2d at 528. Dr. Strek had prescribed medication for Ms. Miller's asthma, had "specifically instructed" her regarding its use, and had advised her that, "in the event of significant asthma symptoms," she should go to the nearest emergency room, which she did "on at least eight different occasions." *Id.* Then, the morning of the day she died, Ms. Miller began experiencing "profound shortness of breath." *Id.* To treat that problem, she "took several doses of medication, with limited success," and then, shortly before noon, called an ambulance. *Id.* At the hospital emergency room, to which the ambulance transported her, Robert Cavens, M.D., the emergency room physician, administered medications and prescribed an electrocardiogram test. *Id.* Ms. Miller, nonetheless, "went into cardiac arrest and died" sixteen minutes after she had summoned the ambulance. *Id.*

Ms. Miller's widower and the administrator of her estate brought a medical malpractice action against Dr. Cavens, alleging that his breach of the standard of care had proximately caused Ms. Miller's death. At the trial of this matter, Dr. Cavens raised a defense of contributory negligence. But, at the close of all the evidence, the trial court granted the estate's motion for judgment on the contributory negligence defense, thereby

18

removing it as a jury question and prohibiting the doctor from arguing to the jury, "that the patient's conduct was the proximate cause of her death." *Id.* After the jury returned a verdict in favor of the estate, Dr. Cavens appealed, challenging, among other things, the trial court's grant of the aforesaid motion. *Id.*

Although the Indiana intermediate appellate court agreed with Dr. Cavens and reversed, 820 N.E.2d 1265 (Ind. Ct. App. 2005), the Supreme Court of Indiana vacated the judgment of the intermediate appellate court and reinstated the trial court's judgment. 849 N.E.2d at 534. In doing so, the Indiana Supreme Court declared that to permit "medical malpractice defendants to assert the defense of contributory negligence by reason of a patient's negligence prior to the defendant physician's treatment of the patient conflicts with a long-standing common law principle," namely, that a tortfeasor takes his victim as he finds her. *Id.* at 530 (citing *Restatement* (*Second*) *of Torts*, § 461 (1965)). It explained:

> It is people who are sick or injured that most often seek medical attention. Many of these infirmities result, at least in part, from the patients' own carelessness (e.g. negligent driving or other activities, failure to regularly exercise, unhealthy diet, smoking, etc.).

*Id.* "To permit healthcare providers to assert their patients' pre-treatment negligent conduct to support a contributory negligence defense," reasoned the court, "would absolve such providers from tort responsibility in the event of medical negligence and thus operate to undermine substantially such providers' duty of reasonable care." *Id.*

Then, applying that rule to the facts before it, Indiana's highest court determined that Ms. Miller had sought treatment "in the midst of an acute asthmatic attack," that Dr. Cavens "had the duty to provide reasonable medical care under the circumstances," and

19

that he could not "avoid responsibility for a failure to fulfill such duty by claiming that his patient's prior negligence caused or contributed to the dire condition that necessitated her treatment." *Id.* at 532. The court therefore concluded that, as there was "no evidence" that the decedent had been "under treatment by Dr. Cavens at the time of her alleged excessive use of medication and delay in seeking treatment," there was, "as a matter of law," insufficient evidence of contributory negligence to create a jury issue. *Id.*

In the instant case, as in *Cavens*, any purported negligence by Mr. Barbosa occurred prior to any treatment he subsequently received from Dr. Osbourne. In the words of the *Cavens* Court, Dr. Osbourne cannot "avoid responsibility for a failure to fulfill" her duty to provide reasonable medical care under the circumstances "by claiming that [Mr. Barbosa's] prior negligence caused or contributed to" the condition that necessitated his treatment. *Id.* Thus, in the instant case, as in *Cavens*, there was, "as a matter of law," insufficient evidence of contributory negligence to create a jury issue.

Accordingly, the circuit court committed multiple errors in the instant case: first, in permitting Dr. Osbourne to pursue a defense of contributory negligence based solely upon Mr. Barbosa's pre-treatment conduct; second, in giving a contributory negligence instruction to the jury; and third, in providing the jury with a special verdict sheet, setting forth that defense. We now turn to the question of whether, under the circumstances of this case, the errors committed by the trial court, with respect to that defense, amounted to harmless error.

20

# V

Dr. Osbourne contends that, even if the court erred in permitting her to raise the issue of Mr. Barbosa's purported negligent delay in seeking treatment at every stage of the trial, then erred in instructing the jury that Mr. Barbosa's negligence was a defense and, finally, erred in providing the jury with a special verdict sheet reiterating that instruction, those errors were harmless because the aforementioned special verdict form specifically instructed the jury that, if it did not find that Dr. Osbourne had breached the standard of care, it need not consider whether Mr. Barbosa had been contributorily negligent. And, as the jury did not find that Dr. Osbourne had deviated from the standard, the doctor reasons, it never reached the question of Mr. Barbosa's negligence, as reflected by the special verdict form, and thus, none of the foregoing errors either individually or collectively rose above harmless error.

To establish reversible error, the Barbosas, as the "complaining party," must show that the error was so "prejudicial" that it "was likely to have affected the verdict below." *Flores v. Bell*, 398 Md. 27, 33 (2007). That is to say, reversal is required if it is more likely than not that the error influenced the verdict. *Barksdale v. Wilkowsky*, 419 Md. 649, 662 & n.9 (2011). And we believe that is so here for two independent but factually-related reasons. The first reason is the repeated invocation, by the defense, of Mr. Barbosa's alleged negligence in failing to seek immediate treatment that pervaded every aspect of the

trial below. It was raised, by the defense, in opening statement;[11] during the cross-examination of the Barbosas' lay and expert witnesses; then, during the direct examination of Dr. Osbourne's three expert witnesses;[12] and, finally, stressed in closing argument,[13] whereupon the jury received oral and written instructions as to the relevance of Mr. Barbosa's alleged negligence.

The second reason is that, although the special verdict form separated the parties' conflicting claims of negligence and instructed the order in which they were to be considered, the defense relentlessly blended the two issues, by repeatedly inviting the jury to find, when it considered whether Dr. Osbourne had violated the standard of care, that

---

[11] Defense counsel stated that Mr. Barbosa's gallbladder surgery was "a difficult procedure," which involved "a known risk," and that the "unavoidable complication" in that surgery "could have all been avoided if Mr. Barbosa had stayed in the hospital when he came for the first visit."

[12] The first medical expert for the defense, Thomas Magnuson, M.D., testified that, had Mr. Barbosa elected immediate surgery on June 12th, the day of his first appearance at the emergency room, "it would have been a much easier operation," and he did not believe that "the common duct injury would have occurred." The second medical expert for the defense, Robert Daniel Odze, M.D., testified that, on June 12th, the date of Mr. Barbosa's first emergency room visit, his gallbladder would "[p]robably not" have been necrotic and that "[w]hat he wouldn't have had on June 12th is all the scar tissue and fibrous tissue that was subsequently developed between the period of time of June 12th and June 24th." The third medical expert for the defense, Keith William Millikan, M.D., testified that there "was no negligence [by Dr. Osbourne] that caused any injury here" and that, had Mr. Barbosa "stayed for treatment on June the 12th," he probably would have had his gallbladder removed within the next day and that he "would not have sustained the injury that happened on . . . June 24th."

[13] During closing argument, defense counsel told the jury that she wanted "to talk a bit about June the 12th," which was "important to the case because the issue before you is the reasonableness of Mr. Barbosa's conduct in leaving the emergency room without getting care."

22

Mr. Barbosa's unnecessary delay in seeking treatment had all but ensured an unsatisfactory outcome and thus she could not be held accountable for that result. In other words, the jury was, in effect, at every turn urged by the defense that, in determining whether Dr. Osbourne had been negligent, it must first consider the circumstances engendered by Mr. Barbosa's failure to pursue treatment. The defense thereby invited the jury to consider Mr. Barbosa's negligence in deciding the very first question of the special verdict form, namely, whether Dr. Osbourne had deviated from the standard of care. Consequently, we conclude that there is no merit to Dr. Osbourne's contention that the special verdict form rendered any error, which the circuit court may have committed in permitting her to present a contributory negligence defense, harmless error.

Finally, Dr. Osbourne's reliance upon *Consolidated Waste Industries, Inc. v. Standard Equipment Co.*, 421 Md. 210 (2011); *Landon v. Zorn*, 389 Md. 206 (2005), *abrogated on other grounds by McQuitty v. Spangler*, 410 Md. 1 (2009); and *Livingstone v. Greater Washington Anesthesiology & Pain Consultants, P.C.*, 187 Md. App. 346 (2009), in support of her harmless error claim is misplaced. Although those three decisions held that the use of a special verdict sheet ensured that any error was harmless, each is readily distinguishable from the instant case.

In two of those cases, *Consolidated Waste Industries* and *Landon*, there was no dispute over the propriety of instructing the jury as to contributory negligence, nor was there any question that that issue could be properly raised in opening and closing argument, as well as adduced testimonially by an assortment of witnesses. *Consol. Waste Indus.*, 421 Md. at 225; *Landon*, 389 Md. at 226. In *Consolidated Waste Industries*, an action involving

23

both negligence and breach-of-contract claims, based upon whether an equipment dealer had performed repairs in a workmanlike and timely manner, the only issue with respect to contributory negligence was whether the verdict sheet improperly combined that issue with the different and distinct issue of the defendant's primary negligence. *Consol. Waste Indus.*, 421 Md. at 224-25. And, in *Landon*, a medical malpractice action in which the plaintiffs alleged that a physician's misdiagnosis had caused one of the plaintiffs to undergo amputation of his right leg, the only issue with respect to contributory negligence was the trial court's refusal to give the plaintiffs' requested special instruction as to that issue, which, insofar as it was a correct statement of the law, was properly covered by the instructions actually given. *Landon*, 389 Md. at 225-27.

In both *Consolidated Waste Industries* and *Landon*, there was no dispute, unlike in the instant case, that contributory negligence was properly raised as a defense under the facts of the case. Indeed, the Landons themselves proposed a jury instruction on that very issue. Here, in contrast, contributory negligence was not properly at issue. Thus, *Consolidated Waste Industries* and *Landon* are of no guidance as to whether the errors before us were harmless.

The third case cited by Dr. Osbourne is *Livingstone v. Greater Washington Anesthesiology & Pain Consultants, P.C.*, *supra*, 187 Md. App. 346, which has even less in common with the instant case than *Consolidated Waste Industries* or *Landon*, as it does not even concern contributory negligence. Like the other two cases, its only relevance to the instant case is that, there, the use of a special verdict sheet had led the appellate court to conclude that an instructional error had not prejudiced the plaintiffs.

24

In sum, because the errors in the instant case pervaded and infected the entire proceedings, we conclude that it is more likely than not that those errors influenced the verdict and, therefore, collectively amounted to more than harmless error. *Barksdale*, *supra*, 419 Md. at 662.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**